Richard G. LOY, Plaintiff-Respondent-Petitioner,

v.

Donna BUNDERSON, State Farm Mutual Automobile Insurance Company, Ralph Truesdill and General Casualty Company of Wisconsin, Defendants-Respondents,

TRAVELERS INSURANCE COMPANY, Defendant-Appellant.†

Supreme Court

*No. 79–1657. Argued February 3, 1982.—Decided June 2, 1982.*

(Also reported in 320 N.W.2d 175.)

† Motion for reconsideration denied, with costs, on July 6, 1982. CECI, J., took no part.

For the plaintiff-petitioner there was a brief by *Richard E. Rosenberg* and *Nowlan & Mouat* of Janesville, and oral argument by *Mr. Rosenberg.*

For the defendant-appellant there was a brief by *Margaret B. Grabowski,* and *Brennan, Steil, Ryan, Basting & MacDougall, S.C.,* and oral argument by *James E. Brennan,* all of Janesville.

HEFFERNAN, J.   This is a review of a decision of the court of appeals[1] which reversed orders of the circuit court for Rock county, MARK J. FARNUM, Circuit Judge, which, pursuant to a declaratory judgment, approved a "special release" that had the effect of releasing General Casualty Company, the insurer of the automobile of Ralph Truesdill, one of the defendants in the action, and Truesdill personally, while leaving in the action

---

[1] *Loy v. Bunderson,* 101 Wis. 2d 215, 304 N.W.2d 140 (Ct. App. 1981).

Travelers Insurance Company, which, under its policy with Chambers & Owen, Truesdill's employer, purported to afford liability coverage in the amount of $500,000 for non-owned (non-owned by Chambers & Owen) automobiles. Such coverage was to be afforded, under the terms of the policy, as "excess insurance over any other valid and collectible insurance available to the Insured." General Casualty Company, Truesdill's insurer, afforded a maximum liability coverage of $50,000.

The court of appeals, relying upon *Heller v. Shapiro,* 208 Wis. 310, 242 N.W. 174 (1932), concluded that the circuit court's declaratory order approving the release constituted an abuse of discretion, because the controversy was not ripe for determination and, hence, not "justiciable" under the provisions of the Declaratory Judgments Act. On this basis alone, the court of appeals reversed. It did not address the merits of the controversy.

We reverse the court of appeals, because we conclude the controversy was justiciable, and we affirm the order of the circuit court confirming the provisions of the "special release."

The first question posed is whether it is within the discretion of a circuit court to issue a declaration approving a proposed release of the named insured, Truesdill, and his insurance company, General Casualty, where, upon payment of $20,000, a release was given for the policy limits of $50,000, leaving intact the plaintiff's cause of action against the "excess" insurer, Travelers, for any sums above $50,000 and within the $500,000 limits of the Travelers policy.

Additionally, if the proceeding to construe and approve the release constitutes a justiciable controversy, then the correctness of the court's declaration on the merits is before us, particularly the court's declaration embodied in its order that, under the release, upon release of Ralph Truesdill and General Casualty, the plaintiff could, nevertheless, pursue his cause of action against Travelers

and that Travelers had a duty to defend Truesdill and, if liability were found, to pay any judgment based on Truesdill's negligence in excess of $50,000. The release also provided that Travelers was to have no cause of action against General Casualty either by virtue of its dismissal from the lawsuit or by reason of any payments Travelers has made or may make in the future, either in the defense of the lawsuit or pursuant to any judgment.

Travelers contends that the provisions of the release, approved by the circuit court and included in its declaratory order, are erroneous as a matter of law.

We disagree with each of Travelers' contentions.

This review has its origin in an automobile accident which occurred on January 23, 1978. Doris Loy was fatally injured when a vehicle driven by Donna Bunderson invaded her lane of traffic and collided head-on. At approximately the same time, a vehicle driven and owned by Ralph Truesdill rear-ended the Loy vehicle.

Action was commenced by Ralph Loy, the deceased's husband, against Bunderson and her insurer, State Farm Mutual Insurance Co., which carried liability limits of $25,000[2] and against Truesdill and General Casualty, the insurer on Truesdill's personal vehicle. General Casualty afforded maximum liability coverage of $50,000. Because Truesdill was in the course of his employment with Chambers & Owen, the employer's liability insurer, Travelers Insurance Company, with policy limits of $500,000, was joined as a defendant. Chambers & Owen was not made a party. The demand of the complaint was for $400,000. Issue was joined.

Although Travelers, in response to interrogatories, denied that Truesdill was an insured under its policy, it

---

[2] Apparently, separate settlement has been made with State Farm—at least no issue in regard to its liability is raised in these proceedings.

admitted in its answer that the automobile driven by Truesdill at the time of the accident was covered by its policy. While these statements, at least in the present stage of the proceedings, are not completely consistent, Travelers does not deny that Truesdill is covered by Travelers' policy, as an employee of Chambers & Owen, driving an automobile not owned by Chambers & Owen.

General Casualty's policy limits liability coverage to $50,000. Travelers' policy extends coverage to limits of $500,000, but one of the conditions of the Travelers' policy is:

"With respect to a *hired automobile* or a *non-owned automobile,* this insurance shall be excess insurance over any other valid and collectible insurance available to the *Insured.*"

The record shows—although Travelers, in this case, considers itself as an excess insurance carrier—this is not a situation in which a particular named insured purchased basic coverage and then purchased additional coverage in excess of its primary contract. Here, the fact of excess coverage is a mere coincidence. Truesdill contracted for his own insurance with General Casualty with limits to $50,000, while Chambers & Owen separately contracted with Travelers for coverage with limits of $500,000. It is only because of the recital in Travelers' policy that its coverage is claimed to be excess over the limits afforded by the General Casualty policy. In the absence of General Casualty's policy, Travelers' coverage would commence at "dollar-one." It is clear, then, that Travelers is not a true excess carrier, because the policy was not written under circumstances where rates were ascertained after giving due consideration to known existing and underlying basic or primary policies. Nothing in the record shows that Chambers & Owen was in

any way benefitted in its premium structure by reason of the existence of Truesdill's General Casualty policy.

After commencement of the lawsuit, settlement negotiations commenced. Originally, plaintiff proposed settlement for $60,000. Later, however, this demand was reduced to $30,000. General Casualty sought a 50 percent contribution from Travelers; but Travelers refused, because the settlement sum was within the limits of General Casualty's policy, and presumably because of Travelers' position that, under its own policy provision denominating it as an excess insurer, it had no responsibility for any exposure not in excess of primary coverage.

It was then that the parties worked out the proposed release that is the subject of the present appeal. This settlement had as its goal the satisfaction of any claim of plaintiff up to $50,000, thus exonerating General Casualty and Truesdill, while permitting the plaintiff, Loy, to continue his action against Travelers for damages in excess of $50,000, but not in excess of Travelers' limits of $500,000. Under this release, Loy agreed, in consideration of the payment of $20,000, to release General Casualty of all liability and also to release General Casualty's named insured, Truesdill, up to, but not exceeding, $50,000. Hence, Truesdill was exonerated of any liability within General Casualty's policy limits. All persons who incurred any liability by reason of Truesdill's negligence were also released up to $50,000. Truesdill, Chambers & Owen, General Casualty, and *Travelers* were freed of any liability within the limits of Truesdill's personal policy.

The claim of Loy against Travelers in the event of a judgment (because of Truesdill's negligence) between $50,000 and $500,000 was expressly reserved. But Truesdill and Chambers & Owen were released of any liability in excess of Travelers' $500,000 coverage. In addition,

Loy agreed to indemnify, defend, and hold Truesdill and General Casualty harmless in the event of any claim by Travelers and to offset any claim of the plaintiff against Travelers to the extent of any collectible claim of Travelers[3] against Truesdill and General Casualty.

The parties to the proposed settlement moved for a declaration of rights permitting the parties to the proposed "special release" to settle and asked that the court declare that, upon compliance with the terms of the release, (1) Truesdill and General Casualty will be dismissed from the action; (2) Travelers is obligated to defend Truesdill because he was employed by Chambers & Owen, Travelers' named insured; (3) Travelers was obligated to pay any judgment based on the negligence of Truesdill in excess of $50,000; and (4) Travelers had no cause of action against Truesdill or General Casualty by reason of their dismissal or by reason of any subsequent payment Travelers might make in settling the claim against Truesdill.

The affidavit accompanying the motion for the declaration recited that there was doubt as to Truesdill's liability, in respect to both negligence and causation. The questionableness of Truesdill's liability is not disputed. The affidavit also makes clear that, by reason of the settlement with General Casualty, any recovery which might be had against Travelers would be credited by the plaintiff with the sum of $50,000, the limits of the Gen-

---

[3] The release as finally executed was substantially the same. It differs in that the dismissal of General Casualty and Truesdill as defendants in Loy's suit was to be with prejudice; and in the event the court approval of the release were reversed on appeal so as to expose Truesdill or General Casualty to liability to the plaintiff, Travelers, Chambers & Owen, the plaintiff would release General Casualty, Travelers, Truesdill, and Chambers & Owen. Those portions of the "special release" which are more appropriately viewed as covenants not to sue will be discussed *infra.*

eral Casualty policy. After hearing, the court entered an order declaring the rights of the parties. It found the controversy to be justiciable, and then proceeded to issue an order granting the motion in its entirety.

Upon Travelers' appeal, the court of appeals reversed solely on the grounds that no justiciable controversy was presented to the court. We conclude that all the elements of justiciability were present; and, accordingly, it was appropriate for the circuit court to issue an order declaring the rights of the parties.

The motion was not brought specifically pursuant to sec. 806.04, Stats., the Uniform Declaratory Judgments Act, but, rather, was made to the court as a part of ongoing litigation. All parties, at all levels of the proceedings, have, however, tested the propriety of the declaration under the standards applicable to the Uniform Act. We conclude that the standards underlying the Act ought to be applied wherever a declaration of rights is sought.

The power of a court to declare rights is broad in scope. There is specific authority under sec. 806.04(1), Stats., to "declare rights, status, and other legal relations whether or not further relief is or could be claimed."

It is exactly this that petitioners on this review sought to have declared: The rights and legal relationships of the parties in respect to each other in the factual context of the case.

Sec. 806.04(2), Stats., gives a court power to define the rights and legal relationship of parties who are arguably affected by a writing in the nature of a contract. Certainly, the underlying insurance policies fall within the express ambit of the statute. It is equally clear that the proposed release is cognizable and subject to construction under the statute.

Courts are admonished by sec. 806.04, Stats., that they may refrain from entering a declaratory judgment where the judgment, if entered, would not end the uncertainty

faced by the parties. In the instant case, it is clear that the controversy faced by the parties was terminated by the entry of the court's order and the subsequent execution of the release.

The controversy is not, and need not be, a controversy in respect to the whole negligence action. All that was posed by the motion is the effort to terminate the controversy between Loy, on one hand, and General Casualty and Truesdill, on the other. A declaration pursuant to the motion terminates any controversy between these parties. Moreover, it limits and defines the parameters of any controversies that remain. It seeks to terminate any possible controversy between Truesdill and his personal insurer in respect to a possible bad faith claim against the carrier, for, under the relief sought to be granted, Truesdill would be discharged of all liability within the policy limits of his own insurance policy and would no longer be subject to suit for any excess.

The numerous uncertainties which existed in respect to the relations between all the parties are clarified and those controversies terminated by the decree sought. The imminent and ripening controversy between General Casualty and Travelers is also laid to rest by the declaration. It is apparent from the correspondence between counsel and the colloquy at the hearing on the motion that Travelers considered that the present conduct of General Casualty was taken in bad faith. There were warnings at the hearing that General Casualty would be "made to pay." The declaration approving the release and the conditions superimposed thereon would terminate the controversy that was inevitable and imminent between General Casualty and Travelers.

Moreover, the legislative direction in respect to the construction of sec. 806.04 (12), Stats., is:

"This section is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and in-

security with respect to rights, status and other relations; and is to be liberally construed and administered."

We have frequently stated the standards for the exercise of trial court discretion to entertain and decide an action for declaratory relief. This court has relied upon the summarization of Borchard, *Declaratory Judgments,* which first appeared in *State ex rel. La Follette v. Dammann,* 220 Wis. 17, 22, 264 N.W. 627 (1936):

"The requisite precedent facts or conditions which the courts generally hold must exist in order that declaratory relief may be obtained may be summarized as follows:

"(1) There must exist a justiciable controversy—that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it.

"(2) The controversy must be between persons whose interests are adverse.

"(3) The party seeking declaratory relief must have a legal interest in the controversy—that is to say, a legally protectible interest.

"(4) The issue involved in the controversy must be ripe for judicial determination. Borchard, Declaratory Judgments, pp. 26–57."

We are of the opinion that a review of Borchard's original text reveals that *La Follette v. Dammann* unduly fragmented the single rule or standards that Borchard suggested be used in determining whether or not it is property within the discretion of a trial court to entertain an action for declaratory action. All that Borchard required is "justiciability." All other tangential considerations referred to in *La Follette* are components of that single test. This fact is specifically recognized in *Lister v. Board of Regents,* 72 Wis. 2d 282, 240 N.W.2d 610 (1976). A comparison of the Borchard text to the four-pronged test used by Justice Nelson in *La Follette* leads to the conclusion that Justice Nelson was perhaps the victim of a printer's error. The punctuation of the

summary and placement of the colon changes the meaning of Borchard's analysis. A reasonable summary of Borchard's position would require the following:

"There must exist a justiciable controversy—that is to say:

"(1) A controversy in which a claim of right is asserted against one who has an interest in contesting it.

"(2) The controversy must be between persons whose interests are adverse.

"(3) The party seeking declaratory relief must have a legal interest in the controversy—that is to say, a legally protectible interest.

"(4) The issue involved in the controversy must be ripe for judicial determination. Borchard, Declaratory Judgments, pp. 26–57."

Any other interpretation of Borchard fails to conform to the clear meaning of the text and has led to discursive and irrelevant exegeses, not only in the briefs of counsel over the years, but in the opinions of this court. The ultimate fact to be found by a circuit court in the exercise of its discretion is "justiciability." If the controversy is "justiciable," by definition it has all the characteristics set forth in the paragraph above. Hence, it is pointless and incorrect to consider justiciability merely as a component of what may be the subject of a declaratory judgment.

Travelers Insurance Company, understandably in view of this court's somewhat incorrect statement of the test over the past forty-five years, asserts there was "no justiciable controversy which was ripe for judicial determination." By Borchard's definition, a justiciable controversy is ripe for determination. We accordingly construe Travelers' attack upon the court's discretion to be but upon a single ground—that, because the controversy is not ripe for adjudication, it is not justiciable. Additionally, Travelers objects because the court is being called upon to render an advisory opinion. Borchard's

text is enlightening on these related concepts and demonstrates that, in the instant case, the court's opinion is not advisory—the controversy is ripe.

Borchard, page 35, states:

"Actions or opinions are denominated 'advisory,' when there is an insufficient interest in the plaintiff or defendant to justify judicial determination, where the judgment sought would not constitute specific relief to a litigant or affect legal relations or where, by reason of inadequacy of parties defendant, the judgment could not be sufficiently conclusive."

Certainly, in the instant case, the opinion is not advisory. The interests of both plaintiff and defendants are great. The adjudication would afford specific relief (this is why Travelers is perturbed). All concerned are parties in the action and have appeared in the trial court for the hearing on the motion for declaratory relief. The judgment rendered is conclusive upon the controversy submitted to the court. Of course, it is not conclusive in respect to the entire cause of action—*i.e.,* the operative facts which led to the lawsuit or to matters of negligence or apportionment—but it is conclusive on the issues that are of importance to the parties as revealed by their motion for declaratory relief.

The fact that the release was not executed at the time the motion was brought is irrelevant. What was sought was not an interpretation of an executed release, but an interpretation of the present status of the parties as the result of pre-existing legal writings (insurance policies) and facts that had occurred at the time of the motion. It was the determination of present rights that enabled the parties to chart a future course of action.

The argument that the judgment is advisory exalts form over substance. The court was clearly required under sec. 805.04(2), Stats.,[4] to approve settlements, re-

---

[4] "805.04 . . . (2) BY ORDER OF COURT. Except as provided in sub. (1), an action shall not be dismissed at the plaintiff's in-

leases, and dismissals. The most that could be required, as a matter of form, would be the submission of an executed release subject to being declared void by the court. But this is implicit in sec. 805.04. No finally effective release could have been submitted. Court approval was required. Hence, to require a ritualistic affixing of signatures to a release that required court approval to be effective would be sheer sophistry. When the court of appeals suggests that an executed release ought to have been submitted—when all the proposed signatories were at the hearing—it proposes an entirely unnecessary and meaningless procedure.

The judgment was not advisory.

Borchard is also instructive on the elements of ripeness as a component of justiciability. He points out, page 56, that facts not sufficiently developed—*i.e.*, "when they are so contingent and uncertain"—will justify a court's refusal to decide. Borchard explains:

"When are the facts contingent? That is not always easy to determine. The Pennsylvania Supreme Court in an exhaustive opinion which has been followed extensively, laid down the rule that the court must be
" 'satisfied that an actual controversy, or the ripening seeds of one, exists between parties, all of whom are *sui juris* and before the court, and that the declaration sought will be a practical help in ending the controversy.'
"By 'ripening seeds' the court meant, not that sufficient accrued facts may be dispensed with, but that a dispute may be tried at its inception before it has accumulated the asperity, distemper, animosity, passion, and violence of the full-blown battle which looms ahead. It describes a state of facts indicating 'imminent' and 'inevitable' litigation, provided the issued is not settled and stabilized by a tranquilizing declaration. The dispute may be determined before the *status quo* has been altered or disturbed by physical acts of either party." Borchard, *Declaratory Judgments* (2d ed.), p. 57.

stance save upon order of court and upon such terms and conditions as the court deems proper. . . ."

He further explains:

"Perhaps the principal contribution that the declaratory judgment has made to the philosophy of procedure is to make it clear that a controversy as to legal rights is as fully determinable before as it is after one or the other party has acted on his own view of his rights and perhaps irretrievably shattered the *status quo.*" P. 58.

Borchard criticizes this court's reasoning and holding in respect to the element of ripeness set forth in *Heller v. Shapiro,* 208 Wis. 310, 242 N.W. 174 (1932). The court of appeals recognized Borchard's criticism of *Heller,* but felt it was obliged to follow *Heller* as a precedential decision of this court. Judge Gartzke, writing for the court, discussed the facts in *Heller* and acknowledged that the plaintiff in that case would undoubtedly have been compelled to pay the first mortgage and that compulsion would have supplied sufficient certainty.

It appears to us that *Heller* went too far in its requirement that all adjudicatory facts be resolved as a prerequisite to a declaration of rights. The *Heller* holding and rationale did not further the purposes for which the Declaratory Judgments Act was adopted by the legislature. *Heller,* if interpreted in accordance with the tenor of its rationale, would erode substantially the authority of a court to declare rights and status, and, if followed to its logical conclusion, would require that all facts at issue, including the ultimate injury or damage to a party, be determinable before declaratory action could be brought. What *Heller* dictates is a traditional lawsuit after a party is aggrieved. It places undue restraints upon the Declaratory Judgments Act and throttles judicial discretion. We expressly overrule it in respect to the statement therein that:

"[T]he declaratory relief statute [only justifies] a declaration of rights upon an existing state of facts, not

one upon a state of facts that may or may not arise in the future." P. 313.

The vice of this statement, if interpreted literally, is that it deprives the trial judge of the discretion to examine the controversy before him to determine the imminence of the controversy or the ripening of the dispute. As Borchard states:

"The imminence and practical certainty of the act or event in issue, or the intent, capacity, and power to perform, create justiciability as clearly as the completed act or event, and is generally easily distinguishable from remote, contingent, and uncertain events that may never happen . . . ." P. 60.

This is exactly the area in which judicial discretion should be allowed to operate. See Borchard, page 61. In the instant case, the trial judge looked to the facts as presented to him by all of the parties' affidavits and statements in open court and stated:

"There seems to be little question but that the first three elements exist so that the Court should entertain declaratory relief if the issues are 'ripe'. In this regard, everything has been done that must be done to liquidate the rights as between the plaintiff Richard Loy, the defendant Ralph Truesdill, and the defendant General Casualty with the issue for determination being only the impact of that action, as a matter of law. Cases are not 'ripe' where contingencies remain but under the proposed settlement there are no contingencies as they pertain to insurance coverage since Travelers ultimate liability remains the same whether there is or is not a settlement. The rationale of 'ripeness' is to avoid Courts entangling themselves in abstract disagreements over administrative or legislative policies. *Lister v. Board of Regents of University of Wisconsin System* (1976) 72 Wis. 2d 282."

While, as in all discretionary acts of a court, reasonable persons may sometimes differ in the outcome, all that this court need find to sustain a discretionary act is

that the trial court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach. *See McCleary v. State,* 49 Wis. 2d 263, 182 N.W.2d 512 (1971).

It is apparent that the trial judge carefully examined all the facts of record and concluded, in the exercise of reasonable and lawful discretion, that the controversy presented by the motion was justiciable. We sustain that exercise of discretion and reverse the decision of the court of appeals.

In concluding our discussion of the appropriateness of the declaratory judgment procedure in this case, the words of this court in *Lister v. Board of Regents,* 72 Wis. 2d 282, 307, 240 N.W.2d 610 (1976), are pertinent:

"The underlying philosophy of the Uniform Declaratory Judgments Act is to enable controversies of a justiciable nature to be brought before the courts for settlement and determination prior to the time that a wrong has been threatened or committed. The purpose is facilitated by authorizing a court to take jurisdiction at a point earlier in time than it would do under ordinary remedial rules and procedures. As such, the Act provides a remedy which is primarily anticipatory or preventative in nature."

Also, the advice of Judge Charles E. Clark in his Hornbook, *Code Pleading* (West 2d ed. 1947), should be considered in the application of the Declaratory Judgments Act:

"The declaratory judgment should not be considered an extraordinary remedy or an unusual or a strange form of action; it should be considered a simple, ordinary, auxiliary remedy—no more strange than injunction, specific performance, or damages—to be asked for and given whenever it will remove uncertainty in the rights of a litigant or settle a controversy existing or *incipient.*" (Emphasis supplied.) P. 336.

It is one thing to conclude that the controversy was justiciable and quite another to hold that the ensuing order appropriately decided the rights of the parties. Because the court of appeals found the question posed was not a justiciable controversy, it did not proceed to the second major aspect of the case—the correctness of the trial court's declaration of rights. The circuit judge in his memorandum opinion correctly capsulized the problem, stating:

"Truesdill and General Casualty want to settle by payment of $20,000.00 to the plaintiff conditioned on plaintiff satisfying any judgment attributable to Truesdill's negligence in the amount of $50,000.00 (General's policy limits) and subject further to plaintiff reserving his action against the additional defendants . . . ."

This was accomplished by a release only "for the purpose of perfecting a settlement of the Fifty Thousand Dollars ($50,000.00) policy limits coverage afforded by General Casualty Company to Ralph Truesdill and for no other purpose." The document expressly reserved any claim which the plaintiff had against Donna Bunderson, State Farm Mutual Automobile Insurance Company, and Travelers. In addition, the plaintiff reserved any claim or cause of action against Truesdill in excess of the $50,-000 policy coverage of General Casualty.

In effect, then, the release as originally submitted to the court preserved a cause of action against Truesdill but discharged the monetary liability only to the extent of $50,000, the coverage of the General Casualty policy. All other rights were reserved, with the additional proviso that the plaintiff would dismiss the pending action against General Casualty and Truesdill, "but not as to Travelers or any obligation they may have by virtue of liability insurance coverage applicable to Ralph Truesdill's negligence . . . ." As a part of this agreement,

Loy also agreed never to institute any suit against Truesdill, General Casualty, or Chambers & Owen.

The effect of this is that General Casualty has discharged *in toto* the obligation to its insured because, in effect, the plaintiff Loy has been satisfied insofar as Chambers & Owen and Truesdill are concerned as if the $50,000 limit of the General Casualty coverage had been paid. The insureds are exposed to no liability to the plaintiff for any claim falling within the limits of General Casualty's policy. Moreover, General Casualty has in no way prejudiced the rights of Travelers. The most Travelers could insist upon was that General Casualty, by the payment of its policy limits, would relieve Travelers of any responsibility for payment below $50,000. Because the plaintiff has agreed that the payment made to him by General Casualty will be credited in the amount of $50,000 against any possible recovery against Travelers, Travelers has received the benefit of its policy provision and is only exposed to liability for sums in excess of the policy limits of the primary carrier. As the trial judge succinctly stated in his opinion:

"Travelers will not be called upon to pay any loss that General Casualty might have paid if the plaintiff is successful in the trial."

We note in passing to what we have alluded to before—that, under the state of this record, where the insured did not purchase two insurance policies, one primary and one excess, Travelers is not in fact an excess insurer which had the opportunity, consciously, to adjust its premium rates on the basis that there was an underlying policy purchased by the same insured.

Here, the fact that there were two policies, one Truesdill's and the other Chambers & Owen's is sheer coincidence. Looking at Travelers' policy alone, it had the contractual duty to defend *ab initio* and to pay from

"dollar-one." The fact of the matter is that Travelers is not aggrieved. It is benefited by a fortuitous coincidence; and it clearly has the duty to continue with the defense for the potential liability reserved, that which falls between the policy limits of General Casualty and the policy limits in excess of Travelers' $500,000 coverage. The relief afforded by the settlement benefits Travelers in still another respect, because it obviates any possibility of a verdict in excess of Travelers' policy limits and saves Travelers from a possible claim of bad faith by any insured. It cannot, under the release, be liable for more than it contracted to pay.

Thus, we see no fundamental unfairness in this agreement. General Casualty has discharged its duty under its policy and has a right to be exonerated from further liability. It has satisfied the claim of the plaintiff to the extent of its policy limits. Its insured Truesdill is not exposed to any excess liability by any conduct of General Casualty.

Travelers, however, makes an attack on the very basis of this arrangement. It contends that its insurance policy is one of indemnity only and that, hence, the discharge of all the liabilities of Truesdill and Chambers & Owen relieve it of any obligation whatsoever under its policy. We conclude that this assertion is incorrect for two reasons, (1) that it is clear from the face of the release that the document is primarily a covenant not to sue, and (2) even if construed as a release, under Wisconsin law an automobile accident policy is required to be one of liability and not merely of indemnification. The agreement which is denominated a "special release" is an absolute release of Truesdill and Chambers & Owen only for the liability below $50,000 and in excess of $500,000. It would be inconsistent for Travelers to assert any concern over these released items when they absolutely disavow either an obligation to defend or an obligation to

pay in respect to damages within primary policy limits or in excess of its own limits.

In respect to the area of exposure falling within the policy of Travelers, no absolute release is granted. Ralph Truesdill is dismissed from the action, and there is a covenant not to sue Ralph Truesdill or Chambers & Owen. This is not a release. It constitutes, in respect to the area of Travelers' exposure, a covenant not to sue.

Admittedly, there is some ambiguity, but it is clear from the language of the agreement that the clearly understood intent of all the parties to the hearing and to the declaratory judgment proceedings was to reserve the action against Travelers while abandoning it against other defendants. This court has ratified this procedure. We have followed the precept of Prosser, *Law of Torts* (hornbook series, 4th ed. 1971), sec. 49, p. 304, wherein he said that:

". . . a plaintiff should never be compelled to surrender his cause of action against any wrongdoer unless he has intentionally done so, or unless he has received such full compensation that he is no longer entitled to maintain it."

In both *Brown v. Hammermill Paper Co.*, 88 Wis. 2d 224, 237, 276 NW2d 709 (1979), and *Swanigan v. State Farm Ins. Co.*, 99 Wis. 2d 179, 202, 299 NW2d 234 (1980), we have followed the guideline of Prosser in that we concluded that a plaintiff, if it be his intent, may discharge one defendant to a tort action without discharging another. *Swanigan* is particularly instructive in that it involved the liability of an adult sponsor, a parent, for the negligence of a child. We stated that the effect of that statute, sec. 343.15(2), is to impose financial responsibility on the adult sponsor of a minor driver. In that case, the minor had been released, but we held that the release of the minor did not release

the sponsor, who, under the circumstances, was in the position of an initial insurer of the minor's negligence.

In the *Brown* case, we specifically relied upon the ruling of *Krenz v. Medical Protective Co.*, 57 Wis. 2d 387, 204 NW2d 663 (1973), for the proposition that an injured party should not be compelled to surrender a claim for relief unless that injured party has intentionally done so or unless there has been full compensation. Accordingly, even in a release situation, the intent of the parties in an ordinary tort case should be controlling. But we reiterate, there was no release of any liability for the negligence of Travelers' insured to the extent that it was covered by the Travelers' policy. There was merely a covenant not to sue. Even in a contract situation, Williston, 10 *Contracts, sec.* 1230, p. 738, states that:

"Whether the creditor releases the principal or grants him an extension of time, an express reservation will preserve his claim against the surety."

66 Am. Jur. 2d, *Release,* sec. 2, p. 679, summarizes the distinction between a covenant not to sue and a release. It states:

"A covenant not to sue is to be distinguished from a release in that it is not a present abandonment or relinquishment of the right or claim but is merely an agreement not to sue on an existing claim. It does not extinguish the cause of action. As between the parties to the agreement, the final result is the same in both cases. The difference is primarily in the effect as to third parties, and is based mainly on the fact that in the case of a release there is an immediate release or discharge, whereas in the other case there is merely an agreement not to prosecute a suit. A covenant not to sue is nothing but a contract, and should be so construed."

We therefore conclude, looking at the documents themselves, the release and the motions of record which are

before us, that it was the clear intent, with respect to the areas of Travelers' exposure, to enter into a covenant not to sue. As we have stated, however, despite what we deem to be the overwhelming clarity of the intent of the parties, the word, "release," nevertheless is used in the documents. Assuming, then, that there has been a release of the insureds, Truesdill and Chambers & Owen, is the insurer relieved of liability? It is not.

Wisconsin, unlike many states, has a direct action statute. Sec. 632.24, Stats., states:

"632.24 **Direct action against insurer.** Any bond or policy of insurance covering liability to others for negligence makes the insurer liable, up to the amounts stated in the bond or policy, to the persons entitled to recover against the insured for the death of any person or for injury to persons or property, irrespective of whether the liability is presently established or is contingent and to become fixed or certain by final judgment against the insured."

It is important to note that the liability is upon the insurer irrespective of whether there is a final judgment against the insured. It has long been established that, under this language, an insured is not a necessary party. The question posed in this case, however, is whether, assuming an absolute release of the insured after the commencement of the lawsuit, the insurance company nevertheless, under the direct action statute, remains potentially liable for damages to a party who sustained injuries as the consequence of an insured's negligence.

A number of the cases cited in the Travelers' brief arguably could lead to the conclusion that the only obligation of an insurance company is to indemnify its own insured. This proposition, of course, flies in the teeth of the express language of the statute. The insurance company has a direct liability to an injured party if other factors trigger insurance company liability. And

the fact that the insured is not a necessary party proves beyond doubt that indemnification does not discharge an insurance company's obligation under the statute. The cases cited by Travelers generally are those in which there is no underlying liability whatsoever. Obviously, it is the nature of the insured's conduct and its consequences with which an insurance company is concerned. If there is no liability *ab initio* or there can be no liability, there is no responsibility under the contract. To use the words of *Wiechmann v. Huber,* 211 Wis. 333, 336, 248 N.W. 112 (1933) :

"It is quite impossible to read into the statutes an intent to create a liability on the part of the insurance carrier *completely* dissociated from the liability of the insured." (Emphasis supplied.)

But nothing in any of the Wisconsin cases leads to the conclusion that, where an insured has performed a negligent act and the insurance company would otherwise be liable, the discharge or release of the immediate tortfeasor discharges the insurer.

We agree with Travelers' statement which appears in its brief. Travelers, after reciting that it acknowledges that an action may be brought directly without naming the insured and after acknowledging that a plaintiff may proceed with an action even though the statute of limitations has run against the insured, relies upon the general statement in *Nichols v. United States Fidelity & Guaranty Co.,* 13 Wis. 2d 491, 499, 109 N.W.2d 131 (1961) :

"The fact that a third party can sue an insurer of a motor vehicle direct . . . without first recovering a judgment against the insured defendant, does not enlarge the coverage afforded by such policy or determine the insurer's liability thereunder. The third party can only recover from the insurer by virtue of the contract existing between it and its insured . . . ."

That statement is absolutely correct, but it demonstrates that the judgment may be directly against the insurer and that payment must be made directly to the injured party. This is not indemnification, since the insured has in fact paid nothing. It is direct liability to the injured party. Nor does that enlarge coverage or in any way abrogate the terms of the contract. The coverage is what the policy says it shall be, and only if the contract permits recovery for the conduct of the insured can there be a recovery against the insurance company. But the statutes are a part of the contract as a matter of law, and it is clear that the insurer is directly liable under the statute.

As long ago as 1941, Justice Wickhem discussed the relationship of indemnity clauses in insurance policies and contrasted the Wisconsin law with those states in which automobile insurers are permitted to write policies which are only those of indemnity. Justice Wickhem in *New Amsterdam Casualty Co. v. Simpson,* 238 Wis. 550, 554–55, 300 N.W. 367 (1941), write:

"This is not true in Wisconsin. Under sec. 85.93, Stats., the insurance company is made directly liable to the injured party. . . . Hence, the injured party with a cause of action directly against the insurer is in a real, as well as a technical sense, the principal adversary of the insurance company . . . . This [is] quite different from the case of the ordinary indemnity . . . policy where the injured party merely resorts to the policy as an asset of the insured."

Other states have made explicit what is only implicit in Wisconsin. For example, in *Futch v. Fidelity & Casualty Co. of New York* (Ct. App. La. 1961), 136 So. 2d 724, affd 246 La. 688, 166 So. 2d 274 (1974), the Louisiana Court of Appeals, under a Louisiana direct action statute, held that a release given by a claimant upon a settlement with a primary insurer reserving the right

against the excess insurer did not preclude further recovery against the excess insurer although the release stated that the insured was fully released. *See* also *Benroth v. Continental Casualty Co.,* 132 F. Supp. 270 (US DC La., 1955).

The most persuasive case, however, is *Christina Deblon v. Leslie Beaton and Jersey Ins. Co.,* 103 N.J. Super. 345, 247 A. 2d 172 (1968), quoted with approval by 7C Appleman, *Insurance Law and Practice,* sec. 4714, pp. 536–37, for the proposition that a release given by plaintiff upon settlement with the primary liability insurer without prejudice to the rights against an excess insurer does not preclude further recovery against the excess insurer. The excess insurer in that case argued, as does Travelers in this case, that its policy was simply one of indemnity and, accordingly, it had no responsibility in either a situation where there was an absolute release of the insured or a covenant not to sue. However, the court stated that, under the law of New Jersey, the public policy which has been engrafted into statutes is one:

". . . favoring the availability to injured persons of the liability insurance of those whose negligence is the cause of their plight. . . . Furthermore, upon the happening of an accident an injured party acquires an interest in an insurance policy which may be available . . . , and that construction of such policy should be adopted which will afford the widest possible coverage. . . . Accordingly, the policy clause, 'legally obligated to pay,' cannot receive the narrow construction sought by Jersey, grounded as it is in the rather metaphysical approach that the covenant not to sue released Jersey's insured *in toto,* despite its clear intention not to do so. All that is required is a jury verdict of negligence and damages in excess of the primary coverage . . . ." P. 175.

It is notable that in this New Jersey case, as in the one before this court, the primary insurer settled with

the claimant for *less* than its primary coverage limits. The New Jersey court also found that, although the intent was clearly that of a covenant not to sue, the result would be the same had the insured been given a general release. After reaching this conclusion, the court went on to point out that settlements of this nature are to be encouraged and that the public interest requires that a plaintiff be permitted to settle claims against some of the exposed parties without releasing others. The court said:

"The interest of a plaintiff is full compensation, and from his viewpoint it makes no difference whether a recovery is paid by a tortfeasor, his primary insurance carrier, his excess carrier, or any combination of the three." P. 175.

The court pointed out the responsibility of an excess carrier to the insured and stated:

"Since a carrier has a duty to act in good faith where its interests conflict with those of the insured in connection with settlement negotiations, it certainly cannot complain about the partial settlement [with the primary insurer], . . . after . . . refusing to negotiate at all. The law . . . favors settlements . . . and the partial settlement achieved in this case does not prejudice Jersey. As a matter of fact, it aids Jersey in the sense that the release of the individual defendants as to their personal assets will preclude any exposure of Jersey to liability beyond its policy limit . . . ." P. 176.

The New Jersey court also addressed another point argued by Travelers in the instant case, that is, that permitting plaintiff to settle with the individual defendants and the primary insurer without release of the excess insurer would encourage collusion. The New Jersey court answered this contention by stating that:

"[I]nsurers can always rely on the required 'cooperation' clauses of their liability policies . . . . The fact is

. . . that the primary liability insurer, to effect a saving on its policy limits, has settled with plaintiff, and such carrier could not settle its exposure without obtaining a release as to its assureds' personal assets. No obligation runs from the primary carrier to the excess carrier, nor is the latter prejudiced by the partial release in favor of the paying carrier and the concomitant release of the insured. This accords with the modern view that the legal effect of a release on strangers thereto should be determined by the intent of the parties to the release and the extent of compensation paid to the releasor rather than upon outmoded concepts of ancient times." P. 176.

We accept the rationale of the New Jersey court. It comports fully with the purpose of the direct action provisions of the Wisconsin statutes. An insurer is directly liable to the plaintiff if the underlying conditions of negligence are satisfied although, after commencement of the action, the insured is released or protected by an absolute covenant not to sue. The responsibility of an insurance company to an injured party is derivative of the insured's conduct, but it is not derivative of the status of the insured's personal liability to a plaintiff at the time the insurer's contractual obligations are triggered by a judgment for damages.

The circuit court also ruled that Travelers could not pursue a bad faith cause of action against General Casualty as the result of the settlement in this case. Travelers asserts that it has a cause of action against General Casualty for the expenses incurred in contesting General Casualty's "bad faith" in negotiating and entering into the settlement, for abandoning the defense of the allegations of causal negligence on the part of Truesdill before making full payment of the policy limits, and for bad faith failure to settle within the primary limits, thus exposing Travelers to the potential of an excess judgment. We think it clear that the trial court ruled cor-

rectly in barring those causes of action asserted by Travelers against General Casualty.

In respect, first, to the claim that Travelers has the right of recovery over for future expenses that may be incurred in the defense of its liability, it is clear that, by the provisions of Travelers' own policy, that it had the right and duty to defend the lawsuit. This is an obligation that it contracted for and is entirely independent of any obligation that General Casualty had to defend under its separate policy. But there was no contract between General Casualty and Travelers that imposed any obligation on General Casualty to defend claims that arose, or might arise after it settled out, within the parameters of Travelers' coverage.

A similar claim was posed in *United States Fidelity and Guaranty Co. v. Tri-State Ins. Co.*, 285 F. 2d 579 (10th Cir. 1960). Therein, United States Fidelity and Guaranty Co. claimed that it had the right to recover for its defense costs against Tri-State, the primary insurer. In denying this claim, the United States Court of Appeals, after pointing out that there was no contractual relationship between the primary and excess insurer, said:

"U.S.F. & G. also had a policy obligation to defend . . . and this obligation . . . was a primary obligation co-existent with that of Tri-State. The agreement to furnish such service, several with the two companies, is distinct from and in addition to the insuring agreement pertaining to liability. The question here thus narrows to whether contribution will lie between two insurance companies when each has a policy containing a defense agreement. The question has been answered in the negative, and we believe properly so, in a number of cases. The duty to defend is personal to each insurer. The obligation is several and the carrier is not entitled to divide the duty nor require contribution from another absent a specific contractual right." P. 582.

The circuit court in the instant case appropriately held that Travelers Insurance Company has the obligation to defend the allegations of causal negligence against Truesdill.

The other claims of Travelers decided adversely to it by the circuit court are controlled by the facts of this case, and those facts distinguish the situation here from all the cases relied upon by Travelers in its assertion of a cause of action for bad faith against General Casualty. In all cases relied upon, the insured, because of the misconduct of the primary insurer, was exposed to liability not only for excess coverage but also to liability within the range of the primary insurer's obligation. Bad faith can only arise where an insurer has committed the tort against its own insured. Here the insureds were protected from any liability whatsoever.

In the recent case of *Kranzush v. Badger State Mutual Casualty Co.*, 103 Wis. 2d 56, 63, 307 N.W. 2d 256 (1981), we said:

"[I]t is clear that this excess liability bad-faith tort is a vehicle to enforce the insurer's duty to be mindful of the *insured's* interests when settling third-party claims." (Emphasis supplied)

In the same opinion, page 73, we stated:

"The insurer's duty of good faith and fair dealing arises from the insurance contract and runs to the *insured*." (Emphasis supplied)

These statements in *Kranzush* are consistent with earlier decisions of this court which have discussed the nature of the tort of bad faith in an insurance context. *Alt v. American Family Mutual Ins. Co.*, 71 Wis. 2d 340, 237 N.W.2d 706 (1976); *Johnson v. American Family Mutual Ins. Co.*, 93 Wis. 2d 633, 287 N.W.2d 729 (1980).

Because there is no contract between General Casualty and Travelers, the tort of bad faith cannot arise between them on any theory heretofore approved by this court.

The trial judge in his memorandum opinion found, as a matter of fact, that the insured will suffer no loss because the plaintiff will discharge him from the lawsuit. Moreover, the judge found that Travelers, under the release, would not be called upon to pay any loss that General Casualty could have been responsible for in a trial. This is, of course, because the entire primary liability of General Casualty has been satisfied by the plaintiff. The insured, because he is fully discharged of any liability to plaintiff, will have no cause of action against either General Casualty or Travelers, and the only expenses which can be incurred by Travelers are those that it has specifically contracted for—the cost of defense and the obligation to pay if found liable under its policy.

In the instant case, General Casualty fully discharged its duty to its own insured. It settled the claim of the plaintiff as against it within the policy limits and, by its negotiations with the claimant, guaranteed the protection of the insured from any possibility of personal liability for a claim in excess of General Casualty's limits. It also afforded Travelers the maximum protection consistent with General Casualty's obligation and consistent with the "other insurance" provisions of Travelers' policy. By its settlement it protected Travelers from any possibility of liability up to $50,000. This is the most that General Casualty was obligated to do, and it is all that Travelers' "other insurance" provision can require. As pointed out above, Travelers has been benefitted by this settlement.

All that remains is for Travelers to perform the obligation under its own policy for which it has been paid a premium which it considered appropriate at the time it made its contract with Chambers & Owen. General Casualty's duties have been fully performed in a manner that protected its insured and Travelers. Travelers has yet to perform its contractual duties; and because it has

contracted to defend and to pay any possible liability these are obligations which it alone must bear.

The cases upon which Travelers places the most reliance make it clear that the excess insurer's possibility of a claim against a primary insurer can arise only where the insured has been abandoned by the primary carrier. *See, Peter v. Travelers Insurance Co.*, 375 F. Supp. 1347 (US DC CD Calif. 1974), and *Continental Casualty Co. v. Reserve Ins. Co.*, 238 N.W.2d 862 (Minn. 1976). The latter case stated:

"We hold that an excess insurer is subrogated to the insured's rights against a primary insurer for breach of the primary insurer's good-faith duty to settle." P. 864.

Accordingly, it appears that the very authorities relied upon by Travelers predicate the excess insurer's right to recover on the ground that the insured has been damaged by the conduct of the primary insurer. This simply has not happened under the facts here.

An excellent article by Dennis J. Wall, *Bad Faith, Excess Liability Actions by or Against Excess Insurers,* appears in Insurance Counsel Journal, April 1981, p. 311. In summarizing the discussion, the author states that a bad faith suit against a primary insurer may be based only on two possible grounds:

"Either the excess insurer has taken an assignment of the insured's rights, or the excess insurer has paid the excess liability and sues as the insured's equitable assignee or subrogee. In either case, all the excess insurer may assert is the rights of the *insured.*" (Emphasis supplied) P. 324.

The author of the article concludes that none of the theories on which courts have allowed recoveries by an excess insurer against a primary carrier are satisfactorily explained on the basis of accepted legal doctrine. He suggests:

"If excess carriers wish to attempt to condition their liability for excess payments on the primary insurer's good faith, then they should be made to make that attempt by spelling that condition out in plain English in their contracts." P. 324.

As we have pointed out before, too often the insurance companies come to the courts asking that the courts supply the lacunae in their contracts. Certainly, when the dispute concerns legal rights and obligations as between insurance companies, it is not too much to ask that they make specific provisions, either in their contracts or by treaties of understanding between themselves. *See Schoenecker v. Haines*, 88 Wis. 2d 665, 674–75, 277 N.W.2d 782 (1979).

Accordingly, we conclude that the court of appeals erred when it reversed the circuit court order holding that the controversy was justiciable, and we affirm in its totality the order of the circuit court declaring the rights and status of the parties.

*By the Court.*—Decision of the court of appeals reversed; order of the circuit court affirmed.

CECI, J., took no part.

STEINMETZ, J. (*dissenting.*) I find it very challenging but difficult to write a dissent in this case. What started out as a case simply involving the trial court's application of declaratory judgment law has developed through this majority opinion to overthrowing a rule of law regarding declaratory judgment which was decided by this court in 1932 and applied by this court numerous times since and a misapplication of excess carrier rights. The court now hypothesizes that the 1932 court "went too far in its requirement that all adjudicatory facts be resolved as a prerequisite to a declaration of rights." (*Supra,* at 413.) The rule that is expressly overruled, however, does not seem related to the previous statement. It is:

"[T]he declaratory relief statute [only justifies] a declaration of rights upon an existing state of facts, not one upon a state of facts that may or may not arise in the future." *Heller v. Shapiro,* 208 Wis. 310, 313, 242 N.W. 174 (1932).

This quoted statement does not provide a foundation for the majority's fear that *Heller* required all adjudicatory facts be resolved for a valid declaratory judgment to be rendered. *Heller* did not, in the quoted portion which is being reversed, speak to the completion of all issues in the case, but instead, held that a declaratory judgment was limited to facts existing at the time of the application for it, rather than relying upon hypothesis as to which might happen. If the law is altered to call upon judges to declare rights based on non-existing, imagined or hypothesized facts, the age-old basis for determining issues on the basis of established facts will be lost. Even in applications for injunctions where the trial judge must predict the likelihood of success of the applicant's action in determining the issuance, that prediction is based on known, existing facts. I would not reverse the *Heller* language; it should remain applicable, since it makes it clear that trial courts should not offer advisory opinions, no matter how sorely tempted.

This court's interpretation of the text Borchard, *Declaratory Judgments* (1941), in *State ex rel. La Follette v. Dammann,* 220 Wis. 17, 22, 264 N.W. 627 (1936), is found to have been in error only by the majority's unduly fragmenting the single rule or standard of Borchard. According to the majority, all that Borchard requires is "justiciability," as Borchard defines it. The court now holds that the change in the law in Wisconsin regarding declaratory judgments is brought about due to a possible printer's error in the *La Follette* case caused by a misplaced colon.

As previously noted, the majority holds that all that is required for a court to be properly asked for a declara-

tory judgment is "justiciability." *Lister v. Board of Regents,* 72 Wis. 2d 282, 240 N.W.2d 610 (1976), however, interpreted Borchard the same as *State ex rel. La Follette v. Dammann, supra,* and merely placed the "colon" properly. *Lister* listed the same four elements as the *La Follette* case necessary for a controversy to be a proper subject for declaratory relief: (1) Involves a claim of right on the part of the plaintiff which is asserted against one who has an interest in contesting it; (2) is between two persons whose interests are adverse; (3) involves a legally protectible interest in the person seeking declaratory relief; and (4) is ripe for judicial determination.

The majority cites the case of *Lister v. Board of Regents, supra,* at 307, as follows:

"The underlying philosophy of the Uniform Declaratory Judgments Act is to enable controversies of a justiciable nature to be brought before the courts for settlement and determination prior to the time that a wrong has been threatened or committed. The purpose is facilitated by authorizing a court to take jurisdiction at a point earlier in time than it would do under ordinary remedial rules and procedures. As such, the Act provides a remedy which is primarily anticipatory or preventative in nature."

Though that is good law, it is not applicable to this case. The wrong that was sought to be prevented in *Lister* was the position taken by the university that the plaintiff's students were nonresidents for tuition purposes. In the instant case, there was no wrong sought to be prevented; rather the wrong involved was the negligence which earlier caused the death of Mrs. Loy and which was not preventable.

In addition to the material cited by the majority from Borchard, *Declaratory Judgments,* that text also states:

"In general, it may be said that the facts on which a legal decision is demanded must have accrued, for the

principle of a declaratory judgment is that it declares the existing law on an existing state of facts. The danger or dilemma of the plaintiff must be present, not contingent on the happening of hypothetical future events —although it may involve future benefits or disadvantages—and the prejudice to his position must be actual and genuine and not merely possible or remote." *Id.* at 56.

Borchard between pages 26–57 does state: "Justiciability is the necessary condition of judicial relief." *Id.* at 33. However, the same section of the text also states: "What, then, are the 'necessary features' of justiciability?" *Id.* at 33–34. The author then lists the necessary features of justiciability as adverse interest, actual controversy, legal interest and ripeness of issue.

Nowhere does Borchard set out the elements of justiciability in the form cited in *State ex rel. La Follette v. Dammann, supra,* and as quoted from that case that has been criticized in the majority opinion.

In any given case, the court must determine whether the facts are sufficiently developed to permit a conclusive adjudication or whether they are so contingent and uncertain as to justify a refusal to render a decision. Borchard, *supra,* at 26–57.

The majority uses convoluted and inverted reasoning when it states: "If the controversy is 'justiciable,' by definition it has all the characteristics set forth in the paragraph above." (*Supra,* at 410.) That is putting the proverbial cart before the horse, since the elements described by Borchard must be present to determine justiciability.

The majority also states that Borchard defines a justiciable controversy as one ripe for determination. However, Borchard requires as an *element* in determining justiciability that the controversy must be ripe for determination. It is not rational to say that a controversy

is justiciable and, therefore, has all of the necessary elements, but rather it must have all of the elements present for a court to determine that it is justiciable.

Some writers have stated that: " 'Justiciability' is a concept of uncertain meaning and scope." 23A *Words and Phrases,* (1981 Pocket Part).

1 Anderson, *Actions for Declaratory Judgments,* sec. 9, (1951) states:

"The adjudicated cases are without dissent in holding that in order for the courts to entertain an action for declaratory relief, there must be a justiciable controversy; sometimes this is referred to as actual, real or bona fide controversy." *Id.* at 38.

"To state a cause of action for declaratory relief, it is necessary to state facts from which the court can see that a valid present controversy is presented. . . .

"The apprehended risk of an applicant for declaratory relief must not exist in the future and rest upon some future or hypothetical contingency that may occur or may not. . . .

"The rule with respect to the necessity for a justiciable controversy may be stated in the vernacular in this wise: The Uniform Declaratory Judgment Act does not license litigants to fish in judicial ponds for legal advice." *Id.* at 46–47.

"A Declaratory Judgment Statute cannot be so construed as to authorize the courts to deliver advisory opinions or pronounce judgments on abstract questions, but there must be the invariable justiciable controversy present in such cases." *Id.* at 50.

"A mere advisory opinion upon an abstract question is obviously not a judgment at all when no parties are to be bound, and the rights of no one are directly affected." *Id.* at 55.

As a demonstration of the advisory nature of the opinion in this case, the following is language of plaintiff's attorney and the attorney for General Casualty at the hearing:

"[General Casualty has] offered to pay it, if the plaintiff can get Court approval, for a particular kind of release. . . .

"And if indeed we get Court approval for this settlement, that's a condition General Casualty imposed upon entering into the settlement. . . .

"[T]hat's exactly why we have made as a condition of settlement we told Mr. Rosenberg you want twenty for everything or twenty and you get Court approval. That's why we are seeking Court approval. . . .

"And I don't think it's bad faith for General Casualty to seek Court *advice* before entering into any settlement before that's done." (Emphasis added.)

It's obvious that absent the court's favorable ruling, General Casualty would not have bound itself to the settlement agreement.

The court of appeals discerned the nature of the motion brought by plaintiff when that court stated:

"If plaintiff were to have received an adverse decision regarding the effect of the proposed release, nothing prevented him from returning to the court as often as necessary to devise a release satisfactory to him. Courts should not act in a mere advisory capacity." *Loy v. Bunderson*, 101 Wis. 2d 215, 222, 304 N.W.2d 140 (Ct. App. 1981).

The majority concedes it was a *proposed* settlement in its statement: "The parties to the *proposed* settlement moved for a declaration of rights permitting the parties to the proposed 'special release' to settle and asked that the court declare that, . . ." (*Supra*, at 406.) (Emphasis added.)

The majority cited sec. 805.04(2), Stats., which is irrelevant to the issue in this case, because no permission of the court was needed to dismiss the action against Ralph Truesdill or to enter into a settlement and release.

*McCleary v. State,* 49 Wis. 2d 263, 182 N.W.2d 512 (1971), was improperly relied upon by the majority. If the motion before the court in this case was not justiciable, then the court had no discretion to render an advisory opinion. *McCleary* involved an abuse of discretion by the trial court in imposing sentence in a criminal case.

I disagree with the majority that the settlement which included the rights of all parties except Travelers was a subject "ripe for judicial determination." If the decision of the trial court had been that Travelers' position on excess coverage was correct rather than General Casualty's, it would be ludicrous to presume that Truesdill, Chambers & Owen and General Casualty would have been bound by that opinion and would have been required to sign releases accordingly. It cannot be any reasonable person's opinion that the parties would have been bound to a negative holding with respect to their positions. The releases had not been signed, and, therefore, the court merely gave an advisory opinion which in this case favored and was therefore acceptable to the proponents, Truesdill, General Casualty and Chambers & Owen. For that reason alone, they complied with the opinion by subsequently signing the release. The only party negatively affected by the trial court's decision was Travelers, which was the only party opposing the proposed nonbinding settlement. The decision did not affect existing "legal relations" as required by Borchard; it merely told the parties what their proposed action would mean, and thus, it must properly be characterized as an advisory opinion.

It follows that declaratory judgment was not appropriate, and an advisory opinion was given contrary to established law.

It is difficult to tell how the majority reverses the court of appeals and sustains the trial court, since at the trial court, the parties agreed that Travelers was an

excess carrier as opposed to the primary carrier, General Casualty, and the trial court treated Travelers accordingly. The majority opinion, however, first finds that Travelers was *not* an excess carrier and then proceeds to analyze Travelers' rights, duties and obligations as an excess carrier. At various points in the decision, the majority finds:

(1) Travelers' policy read under its terms that the coverage afforded was as "excess insurance over any other valid and collectible insurance available to the Insured." (*Supra*, at 402.)

(2) "It is only because of the recital in the Travelers' policy that its coverage is claimed to be excess over the limits afforded by the General Casualty policy." (*Supra*, at 404.)

(3) "In the absence of General Casualty's policy, Travelers' coverage would commence at 'dollar-one.' It is clear, then that Travelers is not a true excess carrier, because the policy was not written under circumstances where rates were ascertained after giving due consideration to known existing and underlying basic or primary policies. Nothing in the record shows that Chambers & Owen was in any way benefited in its premium structure by reason of the existence of Truesdill's General Casualty policy." (*Supra*, at 404.)

(4) "Because the plaintiff has agreed that the payment made to him by General Casualty will be credited in the amount of $50,000 against any possible recovery against Travelers, Travelers has received the benefit of its policy provision and is only exposed to liability for sums in excess of the policy limits of the *primary carrier.* As the trial judge succinctly stated in his opinion:

" 'Travelers will not be called upon to pay any loss that General Casualty might have paid if the plaintiff is successful in the trial.' " (*Supra*, at 417.) (Emphasis added.)

(5) "We note in passing to what we have alluded to before—that, under the state of this record, where the insured did not purchase two insurance policies, one primary and one excess, Travelers is not in fact an excess insurer which had the opportunity, consciously, to

adjust its premium rates on the basis that there was an underlying policy purchased by the same insured." (*Supra,* at 417.)

(6) "Here, the fact that there were two policies, one Truesdill's and the other Chambers & Owen's is sheer coincidence." (*Supra,* at 417.)

It is assumed the majority is sustaining the trial court's misapplication of excess coverage law, even though the majority holds Travelers' coverage was not excess. That makes writing this dissent similar to holding smoke, since there is no substance to which this author may directly respond.

It appears that the majority does not believe that Travelers' coverage is excess with respect to General Casualty's coverage, even though the trial court did so believe and decided the matter on that basis. However, the relationship between the two coverages makes a great deal of difference in the resolution of this case.

If both coverages are primary and as the court holds, Travelers' "had the contractual duty to defend *ab initio* and to pay from 'dollar-one' " (*supra,* at 417), then there is a good argument that the release of Truesdill was the release of both his primary carriers, General Casualty and Travelers, regardless of the language of the "special release."

If Travelers' coverage was excess for non-owned vehicles, *i.e.,* non-owned by Chambers & Owen, as stated in its policy, there is a well-established legal precedent that General Casualty had to pay *all* its policy limits before Travelers' exposure arose.

16 Couch, *Insurance* 2d, sec. 62.60 (1966) at 508–09 states:

"Where the owner of an automobile or truck has a policy with an omnibus clause and the additional insured also has a policy with a nonownership clause which provides that it shall constitute excess coverage over and above any other valid, collectible insurance, the owner's

insurance has the primary liability. In such a situation, the liability of the excess insurer does not arise until the limits of the collectible insurance under the primary policy has been exceeded. It follows that the so-called 'other insurance' clause in the primary policy excluding or modifying liability if the additional insured has other valid and collectible insurance is inapplicable because the insurance under the excess coverage policy is not to be regarded as other collectible insurance available to the insured until the primary policy has been exhausted."

The majority twice refers to the lack of proof in this case with regard to Travelers' premium charge to Chambers & Owen demonstrating its coverage was excess. This ignores the language of the policy and the known fact in the record that Truesdill was an employee of Chambers & Owen. Truesdill carried his own policy with General Casualty Company on his owned automobile. To cover the risk that Chambers & Owen had as his employer, it insured non-owned vehicles (non-owned by Chambers & Owen) driven by employees. This was necessary for the employer's protection for the acts of Truesdill, its employee, and therefore its agent, while he operated his own vehicle. Chambers & Owen was protecting its interests as Truesdill's principal with excess coverage over and above his policy with General, the primary carrier. There was no need for proof as to premiums to demonstrate this obvious and admitted relationship.

To state as the majority does that: "Here, the fact that there were two policies, one Truesdill's and the other Chambers & Owen's, is sheer coincidence" is to ignore the facts of the relationship of employer-employee, owned—non-owned automobiles, the agreement of the parties that General had primary coverage and Travelers had excess coverage, and the basis on which the trial judge decided the issue.

In the trial court, as previously noted, the parties agreed that General carried the primary coverage and

Travelers the excess coverage. That fact was before the trial court when the judge improperly entertained the motion. Yet, here the majority rewrites the facts agreed to in the trial court and states that Travelers owed from dollar-one.

If Travelers' policy was excess coverage, then that policy only required it to "pay on behalf of the *Insured* all sums which the *Insured* shall become legally obligated to pay as damages . . ." As the excess carrier, Travelers was not legally obligated to pay until General's $50,000 limits were exhausted and not just forgiven by the plaintiff.

This action went through the pleading stages as a tort case. It was not until sometime after the action commenced that the plaintiff, Truesdill, Chambers & Owen and General Casualty moved the court to give an advisory opinion as to the legal ramifications of a proposed settlement. The trial court stated in its decision that: "[I]t appears that Travelers does have the right to contest that interest [General's right to settle its interest] so that the test of 'justiciable controversy' is met."

In reality, Travelers opposed the motion for declaratory judgment, because it was not a proper motion. Travelers, in contesting the appropriateness of the motion, did not thereby lend the necessary opposition to the propriety of hearing the motion whereby the other parties sought the advice and opinion of the court regarding the contemplated settlement. The opposition to the motion did not create a justiciable issue with respect to the content of the motion.

When the court entertained the plaintiff's motion to give an advisory opinion, Travelers had no option but to oppose the motion on its merits having lost in its efforts to convince the court to refrain from acting. In reality, the plaintiff, General Casualty, Truesdill and Chambers & Owen were giving up Travelers' rights and

legal interest in the amount between $20,000 and $50,000, General's policy limits.

It is obvious from the record that all of the parties, other than Travelers, agreed to plaintiffs bringing the motion to approve a *proposed* special release.

The record is clear that the plaintiff sought the court's advisory opinion, since the release had not been signed at the time of the motion. Its signing awaited the court's favorable advisory opinion. No amount of vituperation in the majority opinion can stifle this part of the dissent. It is not sophomoric to believe that unless the trial court agreed it was proper to do what the parties proposed, the deal would have been off between them. There was no way the court could render any judgment binding on the parties when the judge gave his opinion. In fact, the judge signed an order[1] not for judgment but

---

[1] The trial court's amended order on motion to settle, dated June 15, 1979, states as follows:

"IT IS HEREBY ORDERED:

"1. That the court has the authority and does in fact enter a declaratory judgment in this matter on the motion.

"2. Plaintiff is permitted to settle his action against Ralph Truesdill and General Casualty Company on a payment by General Casualty Company of $20,000.00 to the plaintiff. Plaintiff in turn must release any obligation of Ralph Truesdill with respect to damages allocated to his causal negligence in the amount of $50,-000.00 in accordance with the policy limits of the General Casualty Company policy.

"3. Upon completing the above transaction, Ralph Truesdill and General Casualty Company shall be dismissed as parties to this action, with prejudice.

"4. Travelers Insurance Company has the obligation to defend the allegations of causal negligence against Ralph Truesdill by virtue of his employment with Chambers & Owen, Travelers' insured.

"5. Travelers Insurance Company is obligated to pay any judgment based on the causal negligence of Ralph Truesdill in excess of $50,000.00 in accordance with and within the limits of the Travelers' policy. This settlement with General Casualty by the

establishing duties and rights of the parties. The only part of the order that resembles an order for judgment is: "(3) Upon completing the above transaction, Ralph Truesdill and General Casualty Company shall be dismissed as parties to this action, with prejudice." Even that part of the order, however, is based on a future contingency, *i.e.*, the completion of the transaction of signing the special release.

The language in *Lubow v. Morrissey*, 13 Wis. 2d 114, 123, 108 N.W.2d 156 (1961), makes clear the obligations of the primary carrier to continue at least until its full policy limits have been exhausted, "the excess clause would prevent payment of any portion by Liberty Mutual until *full collection* had been made from the other two." (Emphasis added.)

Also, in *Lubow, supra,* at 125 the court states: "[A]ny judgment ultimately rendered in favor of a plaintiff must reflect the fact that the insurers who afford insurance which is not excess are *primarily liable up to the applicable policy limits*." (Emphasis added.)

The majority cites *Deblon, et al. v. Beaton, et al.*, 103 N.J. Super. 345, 247 A.2d 172 (1968) with approval and then states: "An insurer is directly liable to the plaintiff if the underlying conditions of negligence are satisfied although, after commencement of the action, the insured is released or protected by an absolute covenant not to

plaintiff automatically credits any judgment based on the causal negligence of Ralph Truesdill in the amount of $50,000.00.

"6. Travelers shall have no cause of action against Ralph Truesdill, Chambers & Owen or General Casualty Company either by virtue of their dismissal from the lawsuit or by reason of any payments Travelers has made or may make in the future either in the defense of the lawsuit or pursuant to any judgment based on the causal negligence of Ralph Truesdill in excess of $50,-000.00.

"7. The defendant Travelers shall pay motion costs to the plaintiff in the amount of $50.00 on this motion."

sue." (*Supra,* at 426.) This is absolutely contrary to a plethora of Wisconsin cases holding that the release of the insured releases the insurer and especially in this case where the policy stated: "The Travelers will pay on behalf of the *Insured* all sums which the *Insured* shall become legally obligated to pay as damages . . . ." Obviously, when the insured no longer has a legal obligation to pay, then there is no further obligation for that insurer.

A significant fact was present in the New Jersey case relied on by the majority that distinguishes that case from the one we are considering, though it is not mentioned in the present majority opinion.[2] The plaintiffs in the New Jersey case did not release Jersey Insurance Company, but also did not waive any rights of plaintiffs against Jersey's insureds under the Jersey policy. Therefore, in that release, the defendants were still liable along with Jersey under terms of the Jersey policy.

In the case under consideration, the "special release" released all claims against Travelers' insured.

The liability of Travelers is predicated upon the liability of its insured, Chambers & Owen, as employer and principal for the negligent employee, Truesdill. There was no way the plaintiff could legally release the liability of Chambers & Owen without releasing Travelers whether by release, special release or covenant not to sue. A covenant not to sue in perpetuity under these circumstances is a ploy and could give rise to a defense by Travelers of lack of cooperation of their insured, Chambers & Owen. Chambers & Owen's actions attempted to cause a loss to Travelers of its legal interest in $30,000 worth of coverage in the General Casualty's policy.

[2] "Additional language of the instrument stated that 'Christina Deblon in no way releases (Jersey) and no rights are waived against said parties [Beaton and Foley] as named assureds under . . . said policy . . . .'" *Deblon v. Beaton,* supra, at 348.

General Casualty had no incentive to settle the claim for the agreed value of $30,000 as long as it could save the difference between the $20,000 which was paid and its $50,000 limit, even though it was the primary carrier.

Again, the majority bemoans the fact that too often insurance companies come to courts asking the courts to fill the gaps or repair the defects in their contracts; however, it does the companies little good to use artfully drawn language when the courts ignore common meaning and usage, as the court has done here. Travelers could not have more clearly expressed the fact that it was an excess carrier than it did in its policy, and yet its policy is treated here as an accidental coincidence in which the language used is rendered meaningless.

I would affirm the court of appeals.