WISCONSIN PATIENTS COMPENSATION FUND,
Plaintiff-Respondent,

v.

ST. PAUL FIRE & MARINE INSURANCE COMPANY, a foreign
insurance corporation, Defendant-Appellant,†

Harry J. WATSON, M.D., Gordon L. Datka, M.D., The
Medical Protective Company, a foreign insurance
corporation, West Allis Memorial Hospital, a domes-
tic corporation, The Continental Insurance Com-
pany, a foreign insurance corporation, and Kessa
Albrecht, by her guardian ad litem, Robert L.
Habush, Defendants.

Supreme Court

*No. 82–1827. Argued January 4, 1984.—Decided January 31, 1984.*

(Also reported in 342 N.W.2d 693.)

† Motion for reconsideration denied March 13, 1984.

For the defendant-appellant there were briefs by *Douglas J. Carroll* and *Arnold, Murray, O'Neill & Schimmel,* Milwaukee, and oral argument by *Mr. Carroll.*

For the plaintiff-respondent there was a brief by *John M. Swietlik, William J. Katt* and *Kasdorf, Dall, Lewis & Swietlik, S.C.,* Milwaukee, and oral argument by *John M. Swietlik.*

SHIRLEY S. ABRAHAMSON, J. This appeal, on certification by the court of appeals, is from a judgment of the circuit court for Milwaukee county, John E. McCormick, Circuit Judge, declaring that the St. Paul Fire and Marine Insurance Company shall make available to the Wisconsin Patients Compensation Fund (the Fund), the total amount of both policies issued to Dr. Harry J. Watson, namely, a physicians malpractice policy in the amount of $100,000 per claim and an umbrella policy, including malpractice coverage, with a liability limit of $1,000,000. The court of appeals certified the appeal to this court to determine whether under ch. 655, Stats. 1975, the Fund pays that portion of a medical malpractice claim against Dr. Watson in excess of $200,000 or whether St. Paul, Dr. Watson's insurer, must pay any claim against Dr. Watson to the full extent of both policy limits before the Fund has any liability. We affirm the judgment of the circuit court.

The facts are undisputed. The Fund commenced a declaratory judgment action[1] on the basis of Kessa Al-

---

[1] St. Paul asserts that the trial court had no jurisdiction to grant the declaratory judgment, and if it had jurisdiction it abused its discretion. We recently discussed declaratory judgment at length in *Loy v. Bunderson,* 107 Wis. 2d 400, 320 N.W.2d 175 (1982). Applying the teachings of *Loy,* we note that the power of a court to declare rights is broad in scope and that in the instant case the trial court's judgment terminated a controversy between the parties and clarified future relations

brecht's having filed, by her guardian ad litem, a submission of controversy pursuant to ch. 655, Stats. 1975, alleging that the medical care provided her by Dr. Watson and others on or about July 30, 1975, constituted malpractice. Ch. 655, 1975, enacted by ch. 37, Laws of 1975, became effective July 24, 1975, except that the coverage provided by the Fund began July 1, 1975. The parties agree that ch. 655 is applicable to the Albrecht claim. Sec. 14, ch. 37, Laws of 1975.

As of the effective date of ch. 655 and on July 30, 1975, the date of the alleged malpractice, Dr. Watson had two insurance policies with St. Paul. One policy, entitled "Physicians, Surgeons and Dentists Professional Liability Policy," provides malpractice coverage with policy limits of $100,000 for each claim and $300,000 per year. The second policy, entitled "Top Brass Personal Catastrophe Liability Policy," provides a multitude of coverages (including medical malpractice) to Dr. Watson and members of his family with policy limits of $1,000,000.

The Fund seeks a judgment declaring that the total $1.1 million coverage of the two St. Paul policies would have to be exhausted before it had any liability relating to Dr. Watson.

The parties agree that the obligations of St. Paul and the Fund are governed by secs. 655.23(5) and 655.27(1), Stats. 1975. This case presents a question of statutory interpretation, a question of law which this court decides without deference to the determination of the circuit court.[2]

---

between the parties. We therefore conclude that the trial court had jurisdiction and did not abuse its discretion.

[2] If we hold against St. Paul on the question of statutory interpretation, St. Paul raises two other defenses which we do not believe need extensive discussion. First, St. Paul asserts that although the Top Brass Policy expressly covers medical malpractice, it is not a health care liability policy within the meaning of ch. 655. We are not persuaded that the title of the policy,

Sec. 655.27(1) governs what portion of a medical malpractice claim is to be paid by the Fund. It states that the Fund pays "that portion of a medical malpractice claim which is in excess of the limit expressed in s. 655.23 (5). . . ."[3] As directed by sec. 655.27(1), we refer to sec. 655.23(5) for "the limit expressed" therein. Sec. 655.23(5), Stats. 1975, provides that "the health care provider [the doctor here] . . . and those conducting the provider's business, including the provider's health care liability insurance carrier [St. Paul here], are liable for malpractice for no more than $200,000 per claim and $600,000 per year *or the maximum limit for which the provider is insured, whichever is higher,* if the health care provider has met the requirements of this chapter." (Emphasis added.)[4] Three limits of liability are ex-

that persons other than the health care providers are included, and that the coverage is in the amount of $1 million make this policy a non-health care liability policy. Second, St. Paul asserts that it is not liable because the Top Brass Policy exempts it from any obligation for which the insured may be liable "under any worker's compensation, unemployment compensation or disability benefits law or under any similar law" and that ch. 655 is a form of disability law. We are not persuaded by St. Paul's argument that the statutory panel determination is in effect similar to worker's compensation.

[3] Sec. 655.27(1), Stats. 1975, provides as follows:

"(1) FUND. There is created a patients compensation fund for the purpose of paying that portion of a medical malpractice claim which is in excess of the limit expressed in s. 655.23(5) and paying future medical expense periodic payments under s. 655.015. The fund shall be liable only for payment of claims against health care providers permanently practicing or operating in this state who have complied with this chapter and reasonable and necessary expenses incurred in payment of claims and administrative expenses incurred under this chapter. The coverage provided by the fund shall begin July 1, 1975, and run thereafter on a fiscal year basis."

[4] Sec. 655.23(5), Stats. 1975, reads as follows:

"(5) While such health care liability insurance, self-insurance or cash or surety bond approved by the commissioner remains in

pressed in sec. 655.23(5): $200,000 per claim, $600,000 per year, and the maximum limit for which the provider is insured.

The Fund asserts that sec. 655.23(5) and sec. 655.27 (1) are perfectly clear and that St. Paul is liable for the maximum limit for which the provider is insured, namely, $1,100,000. The Fund reads the statutes as providing that a health care provider is liable for the higher of $200,000 per claim or the amount for which the provider is insured, and the insurer is liable for the maximum limit for which the provider is insured. The Fund argues that in this case Dr. Harry J. Watson is insured for medical malpractice in the amount of $1,100,000, that the insurer is liable for $1,100,000, and the Fund is liable only for the excess over that amount.

St. Paul contends that it is error to seize simply upon the words "whichever is higher" in sec. 655.23(5). According to St. Paul, the plain meaning of ch. 655, as well as the legislative intent, is to limit any liability of the health care provider to $200,000 per incident regardless of the amount of insurance coverage and to limit the liability of the insurer to the amount of malpractice insurance coverage up to $200,000. St. Paul argues that the "whichever is higher" language of sec. 655.23(5) refers to the situation in which the physician chooses to have less than $200,000 insurance coverage. In that event sec. 655.23(5) was intended to mean that the physician is liable for the higher of (a) $200,000 or (b) that lesser amount of insurance coverage which the physician chose to purchase. St. Paul argues that under ch. 655

force, the health care provider, the provider's estate and those conducting the provider's business, including the provider's health care liability insurance carrier are liable for malpractice for no more than $200,000.00 per claim and $600,000.00 per year *or the maximum liability limit for which the provider is insured, whichever is higher,* if the health care provider has met the requirements of this chapter." (Emphasis supplied.)

even if the doctor secured insurance in excess of $200,000, neither the doctor nor the insurance company would be liable over and above the $200,000 per claim limit. Thus, St. Paul contends that even though it contracted to provide coverage for $1,100,000, ch. 655 places an absolute $200,000 limit on its liability and in effect abrogates the provisions of any insurance contract providing coverage in excess of $200,000 as of the effective date of the statute.

Both parties look to other provisions of ch. 655 to support their respective interpretations of sec. 655.23(5) and sec. 655.27(1). St. Paul says its interpretation of secs. 655.23(5) and 655.27(1) is in harmony with subsections (5)(a) and (5)(d) of sec. 655.27, which refer to the Fund paying a judgment or settlement which is in excess of $200,000.[5]

---

[5] Sec. 655.27(5)(a), Stats. 1975, provides as follows:

"(5) CLAIMS PROCEDURES. (a) Any person may file an action for damages arising out of the rendering of medical care or services against a health care provider covered under the fund provided that such person filing the claim shall not recover against the fund any portion of a judgment for damages arising out of the rendering of medical care or services against a health care provider covered under the fund unless the fund was named as a defendant in the suit. If after reviewing the facts upon which the claim is based, it appears reasonably probable that damages paid on the claim will exceed $200,000, the fund may appear and actively defend itself when named as a defendant in the suit. . . ."

Sec. 655.27(5)(d), Stats. 1975, provides as follows:

"(d) A person who has recovered a final judgment or a settlement approved by the board of governors against a health care provider who is covered by the fund may file a claim with the board of governors to recover that portion of such judgment or settlement which is in excess of $200,000. In the event the fund incurs liability exceeding $1,000,000 to any person under a single claim the fund shall pay not more than $500,000 per year until the claim has been paid in full, and any attorney's fees in connection with such claim shall be similarly prorated."

In contrast, the Fund directs our attention to subsections (5) (b) and (5) (c) of sec. 655.27 which require the approval of the Fund's board of governors for settlements "exceeding $200,000, *or any other amount which could require payment by the Fund.*" The Fund reads these provisions to indicate that the Fund's liability does not always begin at the $200,000 mark.

It is apparent that an answer to the question posed in this case is not to be found in these statutory provisions of ch. 655. Hence we look to the legislative intent to the extent it has been stated explicitly in the legislature's statement of the purpose of ch. 655[6] or may be inferred

[6] Sec. 1, ch. 37, Laws of 1979, set forth the basis for the adoption of ch. 655 as follows:

"SECTION 1. Legislative findings. (1) The legislature finds that:

"(a) The number of suits and claims for damages arising from professional patient care has increased tremendously in the past several years and the size of judgments and settlements in connection therewith has increased even more substantially;

"(b) The effect of such judgments and settlements, based frequently on newly emerging legal precedents, has been to cause the insurance industry to uniformly and substantially increase the cost and limit the availability of professional liability insurance coverage;

"(c) These increased insurance costs are being passed on to patients in the form of higher charges for health care services and facilities;

"(d) The increased costs of providing health care services, the increased incidents of claims and suits against health care providers and the size of such claims and judgments has caused many liability insurance companies to withdraw completely from the insuring of health care providers;

"(e) The rising number of suits and claims is forcing both individual and institutional health care providers to practice defensively, to the detriment of the health care provider and the patient;

"(f) As a result of the current impact of such suits and claims, health care providers are often required, for their own

from the legislative history and bill drafting file of ch. 655. St. Paul urges that its interpretation be adopted because it comports with the legislative intent. St. Paul concludes that ch. 655 "is obviously intended to prevent the purchase of liability insurance by physicians and other health care providers which insurance provides coverage over and above the sum of $200,000, in order to secure the benefits of reduced costs of health care providers, incentive for them to enter and remain in practice in Wisconsin, and thereby benefit the public." (brief, pp. 7–8)

St. Paul is correct that the legislative purpose of enacting ch. 655 was to induce health care providers to stay in practice in Wisconsin by reducing their operating costs. The inducement provided by the statute is limited liability and lower costs to the provider for the coverage provided by the Fund. St. Paul's reading of the statutory provisions does no more to further that purpose than the alternative reading urged by the Fund. Where the pro-

---

protection, to employ extensive diagnostic procedures for their patients, thereby increasing the cost of patient care;

"(g) As another effect of the increase of such suits and claims and the costs thereof, health care providers are reluctant to and may decline to provide certain health care services which might be helpful, but in themselves entail some risk of patient injury;

"(h) The cost and the difficulty in obtaining insurance for health care providers discourages and has discouraged young physicians from entering into the practice of medicine in this state;

"(i) Inability to obtain, and the high cost of obtaining, such insurance has affected and is likely to further affect medical and hospital services available in this state to the detriment of patients, the public and health care providers;

"(j) Some health care providers have curtailed or ceased, or may further curtail or cease, their practices because of the non-availability or high cost of professional liability insurance; and

"(k) It therefor appears that the entire effect of such suits and claims is working to the detriment of the health cure provider, the patient and the public in general."

vider chooses not to take advantage of these lower costs and instead opts for private coverage in excess of $200,000 per claim, the legislative purpose is not even implicated. We conclude that we find no guidance in looking at the legislative purpose.

To aid us in interpreting sec. 655.23 (5) and sec. 655.27 (1), we have also reviewed the legislative history and bill drafting file of these sections. These sections were created as part of 1975 Assembly Bill of 725 which became ch. 37, Laws of 1975.

An early draft of sec. 655.23 (4) and (5) provided simply that health care liability insurance or cash or surety bond shall be sufficient to cover the total potential liability of the provider under ch. 655 and that the provider and the insurer would be "liable for no more than $200,000 per occurrence and $600,000 per year for malpractice." In a later draft, this language was changed to state that health care liability insurance or cash or surety bond shall be in amounts of at least $100,000 per claim and $300,000 per year and to make the provider and insurer "liable for malpractice for no more than $200,000 per claim and $600,000 per year or the maximum liability limit for which [the provider] is insured, whichever is higher." A key to the purpose of the language of sec. 655.23 (5) as it affects insurance coverage in excess of $200,000 in existence on the effective date of ch. 655, as in this case, may be found in sec. 655.27 (5) (f) which coexisted with sec. 655.23 (5) during the drafting stages of the bill. Although sec. 655.23 (5) (f) was vetoed by the governor, its coexistence with sec. 655.23 (5) suggests that the two provisions should be read in harmony and that therefore the Fund's interpretation of sec. 655.23 (5) is the correct one. Sec. 655.27 (5) (f) provided that if the health care provider had, on the effective date of ch. 655, insurance coverage in excess of $200,000 per claim, the health care provider was liable for losses up to the

amount of the insurance coverage and would receive a reduction of the base assessment for the Fund. If sec. 655.27(5)(f) had not been vetoed, St. Paul's liability arguably would be clearer. Sec. 655.27(5)(f), as originally enacted, provided as follows:

"(f) If a health care provider covered by the fund has coverage in excess of $200,000 per claim and $600,000 per policy year which is in effect on the effective date of this act (1975), he shall be liable for losses up to the amount of his coverage, and he shall receive an appropriate reduction of his base assessment for the fund under sub. (3)(a). Such reduction shall be granted only after health care provider has proved to the satisfaction of the board of governors that he has such coverage." Sec. 10, ch. 37, Laws of 1975.

Sec. 655.27(5)(f) was vetoed by Governor Patrick J. Lucey on July 21, 1975. The governor's veto message explained that the purpose of subsection (f) was to protect the health care provider from paying double premiums for double coverage, that is, to the insurer for umbrella coverage purchased before the effective date of the law and to the Fund. To prevent double premiums, sec. 655.27(5)(f) provided for pro-rated reductions in the health care provider's payments to the Fund. Sec. 655.27(5)(f) was simply a short-term measure to protect the health care provider in the transition period from double premiums for double coverage.

The governor's veto message explained, however, that since insurance companies writing umbrella coverage in Wisconsin had assured the state insurance commissioner that they would provide pro-rated refunds when the umbrella policies were canceled, a statute providing for reduced payments to the Fund was unnecessary. The governor's veto explanation stated:

"Section 655.27(5)(f) was inserted to prevent a situation in which health care providers who currently have

umbrella coverage in effect would be forced to pay for double coverage for many months if their insurers would not agree to a pro-rated refund of premiums already paid at the time of cancellation. The insurance commissioner has received assurances from the private carriers who write umbrella coverage in Wisconsin that they will provide pro-rated refunds when the policies are cancelled. In light of those assurances, I have deleted the provision requiring a reduction in base fees for those with policies currently in effect."

Although the significance of the language in sec. 655.27(5)(f) making the provider liable for losses up to the amount of insurance coverage and of the veto is not free from ambiguity, it is apparent from the governor's veto message that the governor interpreted ch. 655 as not affecting the private insurance company's liability for the limits of its policy so that the health care provider who had an umbrella policy had double coverage, that is, from both the insurer and the Fund. The governor vetoed sec. 655.27(5)(f) because an arrangement had been worked out to allow the provider to "cancel" payments for the private coverage as an alternative to the legislature's arrangement in sec. 655.27(5)(f) that the health care provider "cancel" payments for the Fund's coverage. Nothing in ch. 655 or the veto message implies that private insurance coverage in excess of $200,000 has been rendered invalid by the enactment of ch. 655 or by the veto of sec. 655.27(5)(f).

The legislative history of ch. 655 indicates that the legislature assumed that in the future the health care provider would not purchase insurance coverage in excess of $200,000 since such coverage would be unnecessary under the new law. But the legislature did not view ch. 655 as prohibiting the provider from purchasing such insurance or the insurer from selling it, if the provider was willing to pay double premiums—to the Fund and to the insurer.

After analyzing the language of secs. 655.27(1) and 655.23(5), the other provisions of ch. 655, the purposes of ch. 655, and the legislative history, we still do not have a definitive answer to the question posed. Nevertheless, each avenue pursued to discover legislative intent lends support to the Fund's interpretation of secs. 655.23(5) and 655.27(1). St. Paul is asking this court to relieve it of a contractual burden. We cannot adopt St. Paul's position when we can find no clear statutory language or clear expression of legislative intent or purpose to support relieving insurance companies from contractual liability.

For the reasons set forth we conclude that sec. 655.23 (5) and sec. 655.27(1) should be read as the Fund urges. We therefore affirm the judgment of the circuit court.

*By the Court.*—Judgment affirmed.

STEINMETZ, J. (dissenting). The meaning and intent of sec. 655.23(5), Stats., is plain and unambiguous. The portion of that section which the majority holds needs interpretation is: "are liable for malpractice for no more than $200,000 per claim and $600,000 per year or the maximum liability limit for which the *provider is insured,* whichever is higher . . . ." (Emphasis added.) The obvious meaning of this portion is that if the provider carries less than $200,000 per claim, then his carrier is liable up to the limit of the policy and the provider is personally liable for the difference between the coverage limit and the $200,000. It is the $200,000 per claim that is compared to the policy limit, and whichever is higher is applied to the malpractice limit of liability for the provider. If the provider carries less than $200,000 coverage, then the provider is liable up to the higher limit of $200,000. However, the health care provider's limit of liability never exceeds $200,000 which is the amount over which the Fund is liable. This application of the clear meaning is even more clear when it is

considered that the section is found in sec. 655.23 for "Limitations of liability; proof of financial responsibility." That is what is discussed in sec. 655.23(5), *i.e.*, limits of liability. Sec. 655.27(1), the statement of creation for the Patients Compensation Fund, does not conflict with sec. 655.23(5), nor assist in its obvious meaning. Sec. 655.23(5) is self-contained as to its clear meaning.

The majority, to reach a result it wishes, violates several rules of statutory interpretation. The first being that when the statutory language is clear and unambiguous, it is not necessary nor proper to look for legislative meaning elsewhere. The second violation is using one section of the statute to cause confusion in the otherwise clear and unambiguous section. This was done on the basis of the Fund's argument and may be the first time unconvincing argument has risen to the level of authority. Even the majority recognizes the weakness of its position by stating: "[W]e still do not have a definitive answer to the question posed. Nevertheless, each avenue pursued to discover legislative intent lends support to the Fund's interpretation of secs. 655.23(5) and 655.27(1)." (*Supra*, at 548.) That statement is not borne out by the rest of the decision and is also bad mathematics since $2 \times 0$ is still equal to zero.

The final and most unprecedented and unworthy consideration of statutory meaning, when the statute is obvious on its face, is to consider as valuable a former governor's veto of a section of the statute as helpful and as another avenue lending support to the Fund's position. This court does not even consider subsequent legislative action in defining previous legislative intent. *State ex rel. Thompson v. Nash,* 27 Wis. 2d 183, 133 N.W.2d 769 (1965). Certainly a governor's veto message has no persuasive meaning as to legislative intent.

I dissent and would reverse the trial court.