Christina Pitts and Clifford Pitts, Sr.,
Plaintiffs-Petitioners-Appellants,

Wisconsin Physicians Service Insurance
Corporation, a Wisconsin insurance corporation
and Sentry Insurance, a mutual company,
Involuntary-Plaintiffs-Respondents,

v.

Revocable Trust of Dorothy Knueppel, Defendant.

Supreme Court

*No. 2002AP3394. Oral argument October 26, 2004.*
*—Decided June 29, 2005.*

2005 WI 95

(Also reported in 698 N.W.2d 761.)

For the plaintiffs-petitioners-appellants there were briefs by *Mark L. Thomsen, Charles David Schmidt* and *Cannon & Dunphy, S.C.,* Brookfield, and oral argument by *Mark L. Thomsen.*

For the involuntary-plaintiffs-respondents, Sentry Insurance, a mutual company, there was a brief by *Robert F. Johnson, Philip C. Reid, Colleen M. Fleming* and *Cook & Franke, S.C.,* Milwaukee, and oral argument by *Philip C. Reid.*

¶ 1. DAVID T. PROSSER, J. This case is before the court on certification by the court of appeals, pursuant to Wis. Stat. § (Rule) 809.61 (2001–02).[1] The issue presented is whether an underinsured motorist (UIM) insurer has an obligation to consent to, or substitute its own funds for, a proposed settlement between its insured and the tortfeasor, where the tortfeasor's insurer has already settled for its policy limit and the tortfeasor is offering an additional settlement payment in exchange for a full release.

¶ 2. This court has already held that a UIM insurer has an obligation grounded in equity to consent to a settlement or substitute when the settlement offer to its insured emanates from the tortfeasor's insurance company and fully releases both the tortfeasor and the tortfeasor's insurer. *Vogt v. Schroeder,* 129 Wis. 2d 3, 383 N.W.2d 876 (1986). In this case the UIM insurer (also referred to as the "underinsurer") faces an additional level of risk, considering both the uncertainty of the insured's ultimate damages and the uncertainty of the tortfeasor's non-insurance assets. Nevertheless, we conclude that most of the factors that led to our determination in *Vogt* are also present here. Consequently, we hold that the *Vogt* "consent-or-substitute" regimen applies where the insured is willing to accept the tortfeasor's settlement offer.

---

[1] All subsequent references to the Wisconsin Statutes are to the 2001–02 edition unless otherwise noted.

## I. FACTS AND PROCEDURAL HISTORY

¶ 3. The basic facts are undisputed. Christina and Clifford Pitts (Pittses) purchased an automobile insurance policy from Sentry Insurance (Sentry) effective September 29, 1996. The policy provided for $250,000 per person in underinsured motorist (UIM) coverage, with a standard reducing clause.

¶ 4. On December 30, 1996, Christina Pitts (Pitts) was injured in an automobile accident allegedly caused by Dorothy Knueppel (Knueppel). Knueppel had purchased an automobile insurance policy from American Family Mutual Insurance Company (American Family), with $100,000 in liability coverage.

¶ 5. On July 7, 1999, the Pittses commenced a lawsuit against Knueppel and her liability insurer, American Family, claiming damages from the automobile accident. The complaint did not allege a specific amount of damages; it asked for compensatory damages and costs to be determined by a jury.

¶ 6. On September 26, 2000, Knueppel died. The Revocable Trust of Dorothy Knueppel (Trust) was substituted for Knueppel in the lawsuit.

¶ 7. On January 3, 2001, shortly before a scheduled trial, American Family tendered its $100,000 policy limits to the Pittses; and the Pittses' attorney, Mark Thomsen, notified Sentry of American Family's tender that same day. Thereafter, to preserve its subrogation rights, Sentry substituted $100,000 of its own funds in place of American Family's tender. On May 30, 2001, American Family deposited $100,000 into the circuit court and was dismissed from the case.[2]

---

[2] In this case, American Family tendered its policy limits in exchange for a "full release of American Family and its insured."

¶ 8. Also on May 30, Sentry intervened in the case as a defendant against the Pittses. Later, on November 12, 2001, it moved for a declaratory judgment, asserting that the Pittses had made a claim under the UIM provision of the Sentry Policy and that this claim should be adjudicated to determine how much, if any, UIM coverage Sentry would owe. The Pittses opposed Sentry's motion, and Sentry was dismissed from the case without prejudice.

¶ 9. Sentry's dismissal came on June 17, 2002. Two days later, on June 19, the Pittses and the Trust reached a proposed settlement agreement in which the Trust would pay the Pittses $40,000 in return for a release on the Pittses' claims against the Trust. As required by the Sentry policy and by case law, the Pittses' attorney notified Sentry of the settlement offer and requested that Sentry decide whether to consent (and thereby lose its subrogation rights) or substitute its own funds (to preserve its subrogation rights). Sentry objected, claiming that it was not required to consent or substitute under its policy or under existing

_____

This tender was rejected when Sentry chose to substitute its $100,000 pursuant to *Vogt v. Schroeder*, 129 Wis. 2d 3, 383 N.W.2d 876 (1986). Thereafter, Attorney Janet Cain, who represented both American Family and the Knueppel Trust, moved for a declaratory judgment on behalf of American Family to allow American Family to pay its policy limits and be relieved of any further duty to defend or indemnify its insured. Attorney Cain cited *Novak v. American Family Mutual Insurance Co.*, 183 Wis. 2d 133, 515 N.W.2d 504 (Ct. App. 1994), for this procedure. The Trust had no objection to this motion, and the court released American Family from liability upon payment of its $100,000 policy limits to the clerk of circuit court. Accordingly, the Pittses were free to continue to pursue the litigation against the Knueppel Trust.

case law. It contended that it had already paid the Pittses $100,000 to preserve its subrogation rights against the Trust.

¶ 10. Unable to reach an agreement, the Pittses brought Sentry back into the lawsuit as an involuntary plaintiff. On October 9, 2002, the Pittses filed a motion for declaratory judgment asking the court to order Sentry to consent to the settlement or substitute. The Pittses also sought the award of attorney fees pursuant to Wis. Stat. § 806.04 and interest on the settlement amount pursuant to Wis. Stat. § 628.46.

¶ 11. On December 12, 2002, the circuit court for Milwaukee County, Thomas P. Donegan, Judge, denied the motion, leading to this appeal.

¶ 12. The issue again is whether an underinsured motorist (UIM) insurer [Sentry] has an obligation to consent to, or substitute its funds for, a proposed settlement between its insured [the Pittses] and the tortfeasor [the Trust], where the tortfeasor's insurer [American Family] has already settled for its policy limit [$100,000] and the tortfeasor is offering an additional settlement payment [$40,000] in exchange for a full release.

## II. THE SENTRY INSURANCE POLICY

¶ 13. Several provisions of the Sentry policy are important, and we set them out in detail with commentary.

¶ 14. *First,* the Declarations page shows that the Pittses purchased "Underinsured Motorist Bodily Injury" coverage of $250,000 per person and $500,000 per accident.

¶ 15. Under this specific coverage, the insurer never pays the full $250,000 for a single-person accident because the underinsured tortfeasor, by definition,

557

has some insurance and the policy contains a reducing clause. If the tortfeasor had no insurance, the tortfeasor would be "uninsured" rather than "underinsured." Every dollar obtained from the tortfeasor reduces the potential liability of the UIM insurer.

¶ 16. *Second,* the policy provides a broad grant of UIM coverage:

Our Promise To You

We promise to pay damages, excluding punitive or exemplary damages, the owner or operator of an underinsured motor vehicle is legally obligated to pay because of bodily injury you suffer in a car accident . . . as a result of having been struck by an underinsured motor vehicle.

¶ 17. *Third,* the policy defines "Underinsured Motor Vehicle":

An underinsured motor vehicle is a motor vehicle with liability protection afforded by liability insurance policies or bodily injury liability bonds with limits the sum of which are less than the limits you have selected for underinsured motorist coverage as shown on the declarations page. An underinsured motor vehicle does not include an uninsured motor vehicle.

¶ 18. On the facts at hand, Knueppel was the operator of an "underinsured motor vehicle" because her vehicle had "liability protection afforded by liability insurance policies . . . with limits [$100,000] the sum of which are less than the limits [$250,000] you have selected." Until there is a judgment or settlement, a tortfeasor is not "*legally* obligated to pay" damages. But the insurer (or underinsurer) has an obligation to deal

with the insured in good faith at all times. *Danner v. Auto-Owners Ins.*, 2001 WI 90, ¶ 57, 245 Wis. 2d 49, 629 N.W.2d 159.

¶ 19. *Fourth,* the reducing clause is found under the heading "Payment of Damages." It provides:

> . . . The amount of damages payable under this insurance [$250,000] will be the limit of liability *reduced by the amount paid* by or on behalf of anyone responsible for your injury [i.e., the Trust and American Family].

¶ 20. With this reducing clause in place, an insured who purchases $250,000 of underinsured motorist coverage is taking the risk that he or she will not suffer injuries of more than $250,000. If the insured suffers injuries of, say, $500,000, the only chance of being made whole is to be injured by one or more tortfeasors with liability insurance or other available assets equaling the $500,000 in damages. If a tortfeasor has insurance coverage of $250,000 or more, the insured's UIM policy will pay nothing.

¶ 21. *Fifth,* also under the heading "Payment of Damages" is a provision partly responding to the *Vogt* decision:

> No damages will be payable under this insurance, as a result of a car accident with an underinsured motor vehicle until:
>
> a. The sum of the limits of liability of available liability insurance policies or bodily injury liability bonds applicable to the underinsured motor vehicle have been exhausted by payment of judgments or settlements; or
>
> b. A tentative settlement has been made between you and the insurer of the underinsured motor vehicle which would exhaust the limits of liability under any applicable bodily injury liability bonds or policies and

we have prompt written notice of such tentative settle-
ment and advance payment to you in an amount equal
to the tentative settlement within 30 days after receipt
of notification.

Paragraph (a) operates in tandem with the reducing
clause. No damages will be paid to the insured under
UIM coverage until the tortfeasor's limits of liability
insurance have been exhausted. Paragraph (b) contem-
plates the substitution feature of the *Vogt* decision, in
which the insured reaches a settlement with the
tortfeasor's insurer. It requires the insured to provide
prompt written notice to the underinsurer and a sub-
stitution decision from the underinsurer within 30
days. Paragraph (b) does not address the specific situ-
ation here in which the insured reaches a settlement
with the tortfeasor.

¶ 22. *Sixth,* the policy contains a "Trust Agree-
ment" which provides:

When we pay damages under this insurance, you or
your legal representative must agree in writing to
repay us out of any damages recovered from anyone
responsible for your injuries. You or your legal repre-
sentative must also agree in writing to hold in trust and
preserve for us all rights of recovery.

At our request, you or your legal representative must
take any necessary action to recover the payments
we've made under this insurance through a represen-
tative we select. Expenses of recovery will be repaid to
us out of any damages recovered.

The "Trust Agreement" firms up the insurer's subroga-
tion rights.

¶ 23. *Seventh,* the policy contains provisions ad-
dressing "notice" and "consent":

Bodily Injury Not Covered By This Insurance

560

This insurance doesn't cover bodily injury if, without our written consent, settlement is made or judgment is taken against anyone responsible for your injury.

. . . .

Additional Duties

Any person seeking underinsured motorist coverage must also promptly notify us in writing of a tentative settlement between you and the insurer of the underinsured motor vehicle and allow us 30 days to advance payment to you in an amount equal to the tentative settlement to preserve our rights against the insurer, owner or operator of such underinsured motor vehicle.

¶ 24. These provisions require the insured [Pittses] to give the insurer [Sentry] notice of any proposed settlements and to obtain the insurer's [Sentry's] consent prior to accepting settlement offers.

¶ 25. *Eighth,* the policy contains a subrogation clause:

Our Right To Recover From Others

After we have made payment under the Liability, Medical Expense, Uninsured Motorist, Comprehensive, Collision, Road Service or Rental Reimbursement insurance of this policy, we have the right to recover the payment from anyone who may be held responsible. You and anyone we protect must do whatever is necessary to enable us to exercise our right. You and anyone we protect will do nothing to prejudice our rights.

. . . .

Our rights do not apply with respect to Underinsured Motorist Coverage if we have been given prompt written notice of a tentative settlement between you and the insurer of an underinsured motor vehicle and we

fail to advance payment to you in an amount equal to the tentative settlement within 30 days after receipt of notification.

If we advance payment to you in an amount equal to the tentative settlement within 30 days after receipt of notification that payment will be separate from any amount you are entitled to recover under the provisions of Underinsured Motorist Coverage and we also have the right to recover the advance payment.

These provisions also reflect the *Vogt* decision, particularly the insurer's consent feature.

¶ 26. *Ninth,* the policy requires the insured to undergo medical examinations and release medical records at the insurer's request:

If you're injured, we may ask that you be examined by a doctor we select. You must be examined when and as often as we may reasonably require. We may need authorization to obtain medical records and copies of other records. You must give us authorization upon each request.

. . . .

You must cooperate with us in our effort to investigate the accident or loss, settle any claims against you and defend you. . . . If you fail to cooperate . . . we may have the right to refuse you any further protection for the accident or loss.

## III. ANALYSIS

A. Standard of Review

¶ 27. We must determine the respective rights of an insured and insurer under a UIM provision in an automobile insurance contract when the insured has

reached agreement with a tortfeasor on a proposed settlement. This is a question of law that we determine without deference to the circuit court. *Hull v. Heritage Mut. Ins. Co.,* 203 Wis. 2d 547, 551, 553 N.W.2d 295 (Ct. App. 1996) (citing *Schulte v. Frazin,* 176 Wis. 2d 622, 628, 500 N.W.2d 305 (1993)).

## B. Overview of UIM Coverage

¶ 28. Underinsured motorist coverage is intended to protect motorists against inadequately insured tortfeasors. 3 Widiss, *Uninsured and Underinsured Motorist Insurance,* § 31.4, at 5 (2d ed. 2001) (hereinafter Widiss, *Uninsured and Underinsured Motorist Insurance*). Typically, it applies when the tortfeasor's policy has lower liability limits than the insured's UIM coverage. Anderson, *Wisconsin Insurance Law,* § 4.1, at 4–4 (4th ed. 1998) (hereinafter Anderson, *Wisconsin Insurance Law*).[3] In Wisconsin, UIM coverage is optional, not mandatory. *Id.*

¶ 29. Under most UIM policies, "UIM coverage is designed 'to put the insured in the same position as he or she would have occupied had the tortfeasor's liability limits been the same as the underinsured motorist limits purchased by the insured.'" *State Farm Mut. Auto. Ins. Co. v. Langridge,* 2004 WI 113, ¶ 17, 275 Wis. 2d 35, 683 N.W.2d 75 (quoting *Badger Mut. Ins. Co. v. Schmitz,* 2002 WI 98, ¶ 17, 255 Wis. 2d 61, 647 N.W.2d 223). This type of policy has been authorized by the

___

[3] In theory, underinsured motorist coverage could consist of coverage in a set amount "above and beyond the liability limits of the at-fault driver." *Taylor v. Greatway Ins. Co.,* 2001 WI 93, ¶ 35, 245 Wis. 2d 134, 628 N.W.2d 916 (Bradley, J., dissenting). Policies embodying this type of coverage appear to be atypical.

legislature, Wis. Stat. § 632.32(5)(i), and upheld by this court. *Dowhower v. W. Bend Mut. Ins. Co.,* 2000 WI 73, ¶ 33, 236 Wis. 2d 113, 613 N.W.2d 557; *Taylor v. Greatway Ins. Co.,* 2001 WI 93, ¶ 24, 245 Wis. 2d 134, 628 N.W.2d 916.

¶ 30. The Sentry policy clearly incorporates this approach. Therefore, in this case the Pittses could recover a maximum of $150,000 from Sentry under the UIM provisions of the policy because the Sentry policy's $250,000 limit is reduced by Knueppel's American Family policy limit of $100,000.

¶ 31. Sentry has never maintained that Pitts contributed to the cause of the accident. The Trust continues to deny Knueppel's negligence, but it did offer $40,000 above the $100,000 from American Family to settle the case. If Sentry had consented to the settlement between the Pittses and the Trust, it would have reduced its potential liability under the policy to $110,000. Sentry did not consent to the proposed settlement. Instead, it attempted to intervene as a defendant in the action between the Pittses and the Trust, seeking a "once-and-for-all" adjudication of the Pittses' damages that would be binding on the Pittses, Sentry, and the Trust. The Pittses opposed such a determination, believing that *Vogt* gives Sentry, the UIM insurer, only two options: to consent to the settlement or to substitute its own funds. We must now determine which of these competing interpretations is correct.

C. *Vogt v. Schroeder*

¶ 32. The starting point for any such analysis must be our decision in *Vogt.* In *Vogt,* the injured party had been a passenger in a vehicle driven by his son

during a collision with the defendant Schroeder's vehicle. *Vogt,* 129 Wis. 2d at 7. The court noted that the parties implicitly concluded that Schroeder was "primarily, perhaps wholly, liable, because it is conceded, for this appeal at least, that his vehicle invaded the lane of the Vogt vehicle when the collision occurred." *Id.* In effect, the same assumption is made here. Although it has not been determined that Knueppel's negligence caused the accident, we assume for the purposes of this appeal that the Pittses have the right to attempt to draw on the Sentry UIM coverage to make up the difference between the damages available from the tortfeasor and the Sentry policy limits.[4]

¶ 33. In *Vogt,* Schroeder's insurance policy had a limit of only $15,000, and, although nothing in the record explicitly showed that Vogt's damages exceeded that amount, the parties conceded for purposes of the appeal that the damages did exceed $15,000. *Id.* Schroeder's insurer offered to pay its policy limit in exchange for a release of its insured. *Id.* at 8. Vogt wanted to accept the proffered $15,000 and then pursue a UIM claim under his own auto insurance policy with Wisconsin Employers Casualty Company (WECC), which contained $50,000 in underinsured motorist coverage. *Id.* WECC hesitated to consent to the settlement because it felt that its right to subrogation against the tortfeasor could be impaired by such consent.[5] *Id.* At its core, the *Vogt* decision was about subrogation rights.

---

[4] The Sentry policy provides that the UIM provisions cover only damages "the owner or operator of an underinsured motor vehicle is legally obligated to pay because of bodily injury you suffer . . . as a result of having been struck by an underinsured motor vehicle." *See* ¶ 16, *supra.*

[5] The WECC policy at issue in *Vogt v. Schroeder* contained the following settlement provision:

¶ 34. "[S]ubrogation is an equitable doctrine and depends upon a just resolution of a dispute under a particular set of facts." *Id.* at 12 (citing 6A Appleman, *Insurance Law and Practice,* § 4051 at 110). Generally, the doctrine of subrogation "rests upon the equitable principle that one, other than a volunteer, who pays for the wrong of another should be permitted to look to the wrongdoer to the extent he has paid and be subject to the defenses of the wrongdoer." *Garrity v. Rural Mut. Ins. Co.,* 77 Wis. 2d 537, 541, 253 N.W.2d 512 (1977). The doctrine is often invoked after an insurer has compensated its own insured for an accident its insured did not cause. *See, e.g., Rimes v. State Farm Mut. Auto. Ins. Co.,* 106 Wis. 2d 263, 271–72, 316 N.W.2d 348 (1982). The insurer, in some circumstances, steps into the shoes of its insured and may prosecute the tortfeasor to recoup the benefits it paid to its insured. *Patients Comp. Fund v. Lutheran Hosp.,* 223 Wis. 2d 439, 451, 588 N.W.2d 35 (1999) (citing Anderson, *Wisconsin Insurance Law,* § 12.3, at 12–18).

¶ 35. In the *Vogt* case, Schroeder's insurer argued that a UIM insurer or underinsurer never has a right to

---

In the event of any payment under this policy, we are entitled to all the rights of recovery of the person to whom payment was made against another. That person must sign and deliver to us any legal papers relating to that recovery, do whatever else is necessary to help us exercise those rights and do nothing after loss to prejudice our rights.

When a person has been paid damages by us under this policy and also recovers from another, the amount recovered from the other shall be held by that person in trust for us and reimbursed to us to the extent of our payment.

*Vogt v. Schroeder,* 129 Wis. 2d 3, 9, 383 N.W.2d 876 (1986).

subrogation. *Vogt,* 129 Wis. 2d at 11. The *Vogt* court answered this open question by confirming that an underinsurer does have a right to subrogation as long as it substitutes its funds for those proferred by the tortfeasor's insurer. *Id.* at 17–19. However, if the underinsurer chooses simply to consent to the settlement, it forfeits its right to subrogation. *Id.* at 20–21.

¶ 36. The *Vogt* court cited two major factors it believed supported this outcome. First, in the underinsurance context, "the balancing of equities is not between the insurer and its own insured but between the underinsurer and the tortfeasor." *Id.* at 17. This balance weighs in favor of the underinsurer's subrogation right.

¶ 37. Second, the court recognized that a motorist who carries UIM coverage should not be left in a worse position when she is injured by an underinsured motorist than if she has been injured by a fully insured motorist. *Id.* at 17–18. The court noted:

> Such motorist ought to be able to "settle" with the tortfeasor's insurance company to the extent of that tortfeasor's coverage. The motorist should not be required to sue for what is being offered and thus incur larger fees and expenses just to accommodate the underinsurance company's desire to protect its subrogation rights. At least the motorist should not be obligated to do so if it is possible, under the terms of the contract and in justice, for the injured party to receive the settlement proceeds, or its equivalent, and the underinsurer is still able to protect its subrogation rights.

*Id.* at 18.

¶ 38. Having determined that the underinsurer potentially had subrogation rights, the *Vogt* court had to emplace a method to allow the underinsurer to intervene in the settlement process. It adopted a proce-

dure approved by the Minnesota Supreme Court in *Schmidt v. Clothier*, 338 N.W.2d 256 (Minn. 1983). *Vogt*, 129 Wis. 2d at 20–21. In *Schmidt*, the Minnesota court held that the underinsurer was entitled to notice of a potential settlement and a period of time in which to assess the case. *Vogt*, 129 Wis. 2d at 20 (citing *Schmidt*, 338 N.W.2d at 263). The Minnesota court explained its holding:

> In that time [the underinsurer] could evaluate relevant factors, such as the amount of the settlement, the amount of liability insurance remaining, if any, the amount of assets held by the tortfeasor and the likelihood of their recovery via subrogation, the total amount of the insured's damages, and the expenses and risks of litigating the insured's cause of action. If the underinsurer were to determine after assessment that recovery of underinsurance benefits it paid was unlikely (e.g., where the liability limits are exhausted or nearly so and the tortfeasor is judgment-proof), it could simply let the "grace period" expire and permit the settlement and release. It must, of course, thereafter process the underinsurance claim but would not be able to recover those payments through subrogation.
>
> If, on the other hand, damages were substantially more than the liability limits and the tortfeasor had substantial assets, the underinsurer could substitute its payment to the insured in an amount equal to the tentative settlement. In this situation, the underinsurer's payment would protect its subrogation rights to the extent of the payment, and the insured would receive the amount of the settlement offer in cash. The underinsurer would then have to arbitrate the underinsured claim and could, thereafter, attempt to negotiate a better settlement or could proceed to trial in the insured's name.

568

*Id.* at 20–21 (quoting *Schmidt,* 338 N.W.2d at 263) (internal citation omitted).

¶ 39. The quoted passage notes that the underinsurer might consider whether the tortfeasor is judgment-proof. This implies at a minimum that if the underinsurer substitutes its own funds, it has the right to sue all parties released by the proposed settlement. In *Vogt,* this was both the tortfeasor and the tortfeasor's insurer.

¶ 40. The *Vogt* court reasoned that the underinsurer could protect its right to subrogation, but it could not "thwart the right of its own insured to receive some payment, either the amount of the insured's underinsurance claim or the amount offered in settlement." *Id.* at 21. The court thus struck an equitable balance between the right of the insurance company to protect its subrogation interest and the right of the insured to be timely compensated.

D. The Risks of Underinsurance

¶ 41. An underinsurer is placed in a somewhat awkward position upon receiving notice of a settlement like the Pittses' or Vogt's. As we recently recognized, an underinsurer owes a duty of "good faith and fair dealing" to its insured. *Danner,* 245 Wis. 2d 49, ¶ 57. At the same time, the underinsurer has an incentive to minimize its insured's damages while it is negotiating with its insured, thus minimizing its own liability under the policy. However, should it decide to substitute its own funds for those proferred by a tortfeasor's insurer, it must execute a 180–degree turn in the follow-up action against the tortfeasor, attempting to maximize its insured's damages to obtain the largest possible settlement or judgment.

¶ 42. This stylized dance between the underinsurer and its insured necessarily involves some degree of uncertainty because much of the dance occurs before the insured formally makes a UIM claim under the policy. The underinsurer must calculate the value of the damages it believes its insured has suffered. Having arrived at this estimate, if the underinsurer believes the proposed settlement with the tortfeasor is too low, it should substitute its own funds and pursue the tortfeasor and the tortfeasor's insurer in a subrogation action, assuming the tortfeasor has additional assets. On the other hand, if the underinsurer believes the settlement is adequate to cover the insured's damages, it should consent to the settlement with confidence that the insured will not be able to recover additional damages in a subsequent UIM claim. The decision whether to consent should not turn on the source of the settlement funds, but rather on the adequacy of the funds.

¶ 43. In this case, court documents show that the Pittses alleged that Christina Pitts had suffered "permanent injuries, disability, and specials totaling $403,904.70" in damages. Sentry characterizes claims of this magnitude as "questionable." It notes that Pitts had an extensive medical history including involvement in five prior automobile accidents of varying severity.

¶ 44. Under the policy, the Pittses have a contractual duty to cooperate with Sentry during the claim investigation process.[6] In satisfaction of that duty, the Pittses claimed that they sent Sentry "over 1000 pages"

---

[6] The policy provides:

If you're injured, we may ask that you be examined by a doctor we select. You must be examined when and as often as we may reasonably require. We may need authorization to obtain medical records and copies of other records. You must give us authorization upon each request.

of documentation regarding Pitts's injuries. The record includes a summary transmittal form listing several medical reports the Pittses sent, but does not contain the actual reports. Sentry claims that despite its "endeavor[s] to do discovery into the claimed damages[, the Pittses] never complied with the requests." The record reveals that on August 20, 2001, while still a defendant, Sentry sent the Pittses an extensive set of interrogatories. Sentry also included a request for production of documents containing over 20 separate requests for Pitts to release access to her medical records held by various health care providers. The record does not reflect how the Pittses responded, but in a motion filed February 28, 2002, Sentry's counsel asserted:

> Plaintiff would have the court believe that she has provided Sentry with all documents that Sentry needs to fully evaluate the case. That is not true. Plaintiff did not provide Sentry with two examiner reports ... These reports make it abundantly clear that plaintiff's alleged damage claim is not what she says it is.

¶ 45. The issue of whether the Pittses breached their contractual duty to cooperate with Sentry is not before us. However, it must be emphasized that the insured is bound by the terms of the insurance contract. If contractually obligated, the insured must provide the

----

. . . .

You must cooperate with us in our effort to investigate the accident or loss, settle any claims against you and defend you. . . . If you fail to cooperate ... we may have the right to refuse you any further protection for the accident or loss.

*See supra*, ¶ 26.

documentation required by the contract to allow the underinsurer to make an informed decision on whether to consent or substitute.

¶ 46. Effectively, the underinsurer must answer the same question of ultimate damages, whether a settlement offer comes from the tortfeasor's insurer or whether it comes from the tortfeasor herself. In both cases, the underinsurer must evaluate the tortfeasor's personal assets. If the settlement offer fully releases both the tortfeasor and the tortfeasor's insurer but the settlement funds emanate solely from the tortfeasor's insurer, the underinsurer's substitution of its own funds allows it to sue not only the tortfeasor's insurer but also the tortfeasor. Any other result would not make sense. What underinsurer would substitute its funds against a tortfeasor's insurer's tendered policy limits if the underinsurer could proceed only against the tortfeasor's insurer? There would be no point to such an action, because the maximum the underinsurer could recover would be the same amount that was already tendered. The underinsurer's recovery would be further reduced by its costs in prosecuting the action. What makes substitution an attractive option is the possibility that the tortfeasor has substantial wealth or assets, and that the underinsurer will be able to negotiate a better settlement than its insured because of the greater resources at its disposal. In that scenario, both the insured and the underinsurer are benefited. The insured receives a prompt settlement payment and the underinsurer may secure more from the tortfeasor, thereby eliminating or reducing its liability.

¶ 47. In this case, Sentry attempted to remove all uncertainty by intervening in the case between the Pittses and the Trust. Sentry asked the circuit court to

adjudicate the Pittses' damages so that all three parties —Sentry, the Pittses, and the Trust—would have a rock-solid number from which to negotiate. This position is defensible because it would, to some degree, eliminate duplicitous litigation. Once their damages had been determined, the Pittses would be free to settle with the Trust. At that point, it would be obvious to Sentry whether a settlement was adequate, and the decision whether to consent to a settlement would also be relatively simple. Further, any future litigation between the Pittses and Sentry would be simplified. Sentry could start with the arrived-upon damage amount, subtract the amount recovered from the Trust and American Family, and pay the remaining amount to the Pittses (assuming that amount came within the policy limits).

¶ 48. This court could have adopted such an approach in *Vogt*. It did not. Even Sentry's trial counsel admitted that its request and accompanying approach was "novel," but felt that it had "no choice but to ask [the circuit] court to order that the plaintiff continue with her UIM claim against Sentry so the matter can be litigated and eventually resolved."[7] While Sentry's approach is understandably preferable to Sentry, it is not preferable to the Pittses. Sentry's approach might

_____

[7] Under some circumstances, this court has recognized that an insurer does have the right to force litigation against its own insured. *See, e.g., Reid v. Benz,* 2001 WI 106, ¶ 16, 245 Wis. 2d 658, 629 N.W.2d 262 (citing *Elliott v. Donahue,* 169 Wis. 2d 310, 317–18, 485 N.W.2d 403 (1992)). But in those cases, the question was *whether* the insured has coverage, not the *amount* of coverage implicated. *Id.* In this case, the circuit court dismissed Sentry as a defendant because at the time, Pitts had asserted no claim against Sentry, nor was Sentry obligated to defend Pitts in any claim.

eliminate future litigation between the Pittses and Sentry, but it would also have the effect of creating unnecessary litigation between the Pittses and the Trust. Those two parties have already reached what they believe to be an equitable settlement. If Sentry were to accept that proposed settlement, it is possible that the entire matter could be settled without litigation. Instead of adopting Sentry's admittedly "novel" approach, we choose to continue to rely on the principles in *Vogt*.

E. Applicability of *Vogt v. Schroeder*

¶ 49. We believe that the factors relied on in *Schmidt* and *Vogt* are equally applicable to the situation here, where the settlement is not with the tortfeasor's insurer, but rather with the tortfeasor herself. The dual settlements in this case had the same effect as the single settlement in *Vogt*—the full release of both the tortfeasor and the tortfeasor's insurer.[8]

¶ 50. The balance of equities between the under-insurer and the tortfeasor is the same. It is important to preserve the underinsurer's subrogation right, and under this extension of *Vogt* the underinsurer retains the right of subrogation against the tortfeasor.

¶ 51. The second rationale articulated by the *Vogt* court is controlling. As the court noted, an insured motorist has a right to a settlement and should not be required to sue for what is being freely offered, thus

---

[8] See *supra* n.2 for the circumstances surrounding the release. In *Vogt,* the settlement agreement fully released both the tortfeasor *and* his insurer. That is why the second proposed settlement in this case, fully releasing the Trust, moves this case onto the same footing as *Vogt*, with both the tortfeasor and the insured fully released by settlement.

incurring substantial legal fees. *Vogt,* 129 Wis. 2d at 18. The right to a prompt settlement does not depend on whether the motorist has settled with the tortfeasor or the tortfeasor's insurer. Rather, "Wisconsin has a long-standing policy in favor of settlements." *Schulte,* 176 Wis. 2d at 634 (citing *Collins v. Am. Family Mut. Ins. Co.,* 153 Wis. 2d 477, 490, 451 N.W.2d 429 (1990) (internal citations omitted)). Prompt settlement of claims is in the public interest. *See id.* (citing *Loy v. Bunderson,* 107 Wis. 2d 400, 425, 320 N.W.2d 175 (1982)).

¶ 52. Sentry asserts that "until a determination was made as to the value of the Pittses' UIM claim, Sentry would not be in a position to know the amount it would seek in subrogation." The passive construction of that sentence disguises the fundamental question of who must make the critical valuation of the insured's damages. Sentry prefers it to be the circuit court. Under *Vogt,* Sentry must do so on its own. The rationale underpinning the *Vogt* procedure is that an insurer is best suited to determine whether substitution is in its own best interests.

¶ 53. The assessment of risk and uncertainty is at the very heart of the insurer's business. It is the keystone of the insurance enterprise. This court has previously pointed out that "the critical element in [the parties' competing definitions of insurance] is a *contractual shifting of risk in exchange for premiums." Hillegass v. Landwehr,* 176 Wis. 2d 76, 81, 499 N.W.2d 652 (1993) (emphasis added); *see also Nat'l Motorists Ass'n v. Office of the Comm'r of Ins.,* 2002 WI App 308, ¶¶ 31–32, 259 Wis. 2d 240, 655 N.W.2d 179. Indeed, the transfer of risk is the only reason that insureds pay premiums to insurers. *See Black's Law Dictionary* 802 (7th ed. 1999) ("Insurance" is defined as "an agreement

by which one party assumes a risk faced by another party in return for a premium payment."). Sentry, and all insurers, evaluate damages and make determinations about benefits on a daily basis. These determinations inevitably involve a degree of risk, for which insurers are compensated by insureds in the form of premiums.[9]

¶ 54. In *Vogt*, the circuit court stated the issue as follows: "Can the insured [of an underinsured motorist's policy] settle with *the tort feasor*, and receive additional payments from the under-insured motorist's carrier and prevent the underinsured motorist's carrier from exercising subrogation rights of reimbursement against the tort feasor?" *Vogt*, 129 Wis. 2d at 10 (emphasis added). This court did not disturb that statement of the issue, the plain language of which contemplates settlement with *the tortfeasor*. The court concluded that the underinsurer "has the right of subrogation against *the tortfeasor* and his insurer to the extent that the underinsurer has paid benefits to its own insured." *Vogt*, 129 Wis. 2d at 17 (emphasis added).

¶ 55. After holding that the underinsurer had the right to subrogation as long as it substituted its own funds, the court listed several factors the underinsurer might consider in deciding whether to consent or substitute. These factors include "the amount of the settlement, the amount of liability insurance remaining, if any, *the amount of assets held by the tortfeasor and the*

---

[9] In a similar vein, this court has held that "where either the insurer or the insured must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume." *Garrity v. Rural Mut. Ins. Co.*, 77 Wis. 2d 537, 542, 253 N.W.2d 512 (1977) (citing *St. Paul Fire & Marine Ins. Co. v. W.P. Rose Supply Co.*, 198 S.E.2d 482, 484 (N.C. Ct. App. 1973)).

*likelihood of their recovery via subrogation,* the total amount of the insured's damages, and *the expenses and risks of litigating the insured's cause of action."* *Vogt,* 129 Wis. 2d at 20 (quoting *Schmidt,* 338 N.W.2d at 263) (emphasis added). As already discussed, the substitution of the underinsurer's funds gives it the right to proceed against both the tortfeasor and her insurer; this indicates that underinsurers are already making judgments about the risks posed by suing a tortfeasor with uncertain assets.

¶ 56. The "reasonable period" between notice of the proposed settlement and the required decision to consent or substitute gives the underinsurer time to attempt to determine the tortfeasor's assets. Indeed, that is one of the factors expressly delineated in the *Schmidt* decision, as adopted in *Vogt. Vogt,* 129 Wis. 2d at 20. In this case, Sentry *did* attempt to determine the assets in the Trust. *See* Letter from Tina Zblewski, Sentry Claims Representative, to Attorney Thomas Foy (Feb. 12, 2001) (announcing Sentry's intent to substitute its funds for American Family's tendered policy limits, thus maintaining its subrogation right, and requesting counsel to "provide us with an affidavit indicating the assets in the trust"). It is unclear whether Sentry ever received a response to this inquiry, but Sentry had already set in motion the types of inquiries that are necessary to determine whether to consent or substitute when a settlement offer is made by the tortfeasor.[10]

---

[10] In its brief, Sentry asserted that the Trust "appeared to have substantial assets." At the circuit court's hearing on May 17, 2002, counsel for Wisconsin Physicians Service Insurance Corporation, another involuntary plaintiff, stated "[T]he tortfeasor was a millionaire, which there is no question about. The plaintiff would never have any reason to even talk to Sentry

¶ 57. We note that one insurance treatise reviewed standard policy forms from 35 states, and found that 30 of them incorporated the *Schmidt* approach in some form. Schermer, *Automobile Liability Insurance 3d* § 59.10, at 59–34 n.7 (3d ed. 1995). Most jurisdictions following the *Schmidt* approach apply it to settlements with either tortfeasors or tortfeasors' insurers.[11] The most exhaustive treatise on the subject is also in

because they are going to collect everything they need from the tortfeasor." There is no factual support for this assertion in the record, but it illustrates the point that the assets of the tortfeasor are often determinable, thus informing the underinsurer's decision about the risks of substituting its own funds and proceeding directly against the tortfeasor.

[11] *See, e.g.,* 215 Ill. Comp. Stat. 5/143a-2(6) (2004) (Consent or substitute procedure applies "where the insurer has been provided with written notice in advance of a settlement between its insured and *the underinsured motorist*") (emphasis added); *Lambert v. State Farm Mut. Auto. Ins. Co.,* 576 So. 2d 160, 167–68 (Ala. 1991) ("If the underinsured motorist insurance carrier wants to protect its subrogation rights, it must, within a reasonable time . . . advance to its insured an amount equal to *the tort-feasor's* settlement offer") (emphasis added); *Grinnell Mut. Reinsurance Co. v. Recker,* 561 N.W.2d 63, 70 (Iowa 1997) (After insured notified underinsurer of settlement offer, underinsurer "could then have protected its contingent subrogation rights by tendering an amount equal to *the tortfeasors'* settlement offer and substituting its payment for that of the offer") (emphasis added); *Coots v. Allstate Ins. Co.,* 853 S.W.2d 895, 900 (Ky. 1993) ("We conclude that it does not abrogate UIM coverage to settle with *the tortfeasor* and his carrier . . . so long as the UIM insured notifies his UIM carrier of his intent to do so") (emphasis added); *McDonald v. Republic-Franklin Ins. Co.,* 543 N.E.2d 456, 460–61 (Ohio 1989) (*disapproved of on other grounds by Ferrando v. Auto-Owners Mut. Ins. Co.,* 781 N.E.2d 927 (Ohio 2002)); *Hamilton v. Farmers Ins. Co. of Washington,* 733 P.2d 213, 220 (Wash. 1987).

accord: "An [under]insurer may lose the right to be subrogated to an insured's claim by refusing to consent to a settlement with *a tortfeasor or a tortfeasor's insurer.*" 3 Widiss, *Uninsured and Underinsured Motorist Insurance* § 43.6, at 519 (emphasis added); *see also* Anderson, *Wisconsin Insurance Law* § 4.7, at 4–37 ("A UIM insurer is entitled to notice from the insured of settlement with *a tortfeasor* and an opportunity to pursue its right of subrogation") (emphasis added); J. Sue Myatt, *Settlement Procedures in Underinsured Motorist Cases: The Underinsurer's Dilemma Between Preserving the Insurer's Subrogation Right and Protecting the Insured's Settlement Right,* 14 J. Corp. L. 175, 185 (1988) ("Common components of the prescribed settlement procedure include: (1) The insured's notice to the underinsured motorist carrier regarding the underinsurance claim and tentative settlement offer from *the tortfeasor*") (emphasis added) (hereinafter Myatt, *Settlement Procedures in Underinsured Motorist Cases*). Members of this court have touched on the subject in passing: "Under *Vogt,* a plaintiff can take advantage of *the defendant's* settlement offer and an underinsurer can protect its right to subrogation reimbursement." *Ives v. Coopertools,* 208 Wis. 2d 55, 71, 559 N.W.2d 571 (1997) (Geske, J., concurring) (emphasis added).[12]

---

[12] In *Ives,* the six participating justices of this court unanimously agreed that the decision of the court of appeals should be reversed, but evenly split on the proper rationale for the reversal. *Ives v. Coopertools,* 208 Wis. 2d 55, 57, 559 N.W.2d 571 (1997). Therefore, Justice Geske's concurring opinion has no precedential value because it is not the opinion of a majority of the court, and simply serves here to illustrate another reference to the broader application of *Vogt* to settlements with "the defendant" as well as the defendant's insurer.

¶ 58. In summary, we believe that the procedure prescribed in *Vogt* to govern allocation of risk has equal applicability here. When the subrogated underinsurer substitutes its own funds for the settlement funds, it gains the right to proceed against the party or parties that would have been fully released by the settlement agreement.

■■■■

¶ 59. Our continued endorsement of the prescribed *Vogt* procedure will afford a higher degree of certainty to the settlement process in underinsurance claims. *See* Myatt, *Settlement Procedures in Underinsured Motorist Cases* at 197–98. Therefore, we hold that an UIM insurer has an obligation to consent to, or substitute its own funds for, a proposed settlement between its insured and the tortfeasor, where the tortfeasor's insurer has already settled for its policy limit and the tortfeasor is offering an additional settlement payment. This obligation is not triggered, however, if the insured has failed to satisfy its contractual obligation to provide information to the underinsurer to assist the underinsurer in determining damages.

■■■■

¶ 60. Sentry argues that its policy forecloses this result because it expressly adopts the *Vogt* procedure only when its insured settles with the tortfeasor's insurer.[13] The policy is silent on settlements with the tortfeasor herself. Sentry implicitly relies on the maxim, *expressio unius est exclusio alterius* ("The ex-

---

[13] The policy provides: "No damages will be payable under this insurance, as a result of a car accident with an underinsured motor vehicle until . . . [a] tentative settlement has been made between you and the insurer of the underinsured motor vehicle." *See supra,* ¶ 21.

pression of one thing is the exclusion of another."). *Black's Law Dictionary* 1635 (7th ed. 1999). Even if we were to assume that the silence in the policy had significance, the silence in the Sentry policy, like the silence in the WECC policy at issue in *Vogt,* cannot trump public policy. The WECC policy also contained express settlement procedures that did not contemplate the procedure eventually adopted by the *Vogt* court. *Vogt,* 129 Wis. 2d at 9. The court was nonetheless persuaded by the public policy favoring an injured insured's right to prompt settlement. *Id.* at 17–18. Despite the fact that the insurance contract specifically addresses only settlement with a tortfeasor's insurance company, the motorist should not be required to sue for what is being offered by the tortfeasor.

## IV. CONCLUSION

¶ 61. Because the circuit court held that the *Vogt* procedure did not apply here, it never reached the other issues in this case: whether Pitts fully cooperated with Sentry pursuant to the policy, and whether Sentry owes the Pittses interest on the settlement offer pursuant to Wis. Stat. § 628.46 or attorney fees and costs pursuant to Wis. Stat. § 806.04. We express no opinion on those issues, and remand this case to the circuit court to allow it to address them.

*By the Court.*—The order of the circuit court is reversed and the cause is remanded.

¶ 62. JON P. WILCOX, J., did not participate.