## COURT OF APPEALS
## DECISION
## DATED AND FILED

## December 18, 2025

Samuel A. Christensen
Clerk of Court of Appeals

### NOTICE

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal Nos.**  **2025AP1963**
**2025AP1964**
**2025AP1965**
**STATE OF WISCONSIN**

Cir. Ct. Nos. 2024TP2
2024TP3
2024TP4

**IN COURT OF APPEALS**
**DISTRICT IV**

NO. 2025AP1963

IN RE THE TERMINATION OF PARENTAL RIGHTS TO O.J., A PERSON UNDER THE AGE OF 18:

MARQUETTE COUNTY DEPARTMENT OF HUMAN SERVICES,

PETITIONER-RESPONDENT,

V.

J.J.,

RESPONDENT-APPELLANT.

NO. 2025AP1964

IN RE THE TERMINATION OF PARENTAL RIGHTS TO K.J., A PERSON UNDER THE AGE OF 18:

MARQUETTE COUNTY DEPARTMENT OF HUMAN SERVICES,

PETITIONER-RESPONDENT,

V.

**J.J.,**

    **RESPONDENT-APPELLANT.**

---

**NO. 2025AP1965**

**IN RE THE TERMINATION OF PARENTAL RIGHTS TO P.J., A PERSON UNDER THE AGE OF 18:**

**MARQUETTE COUNTY DEPARTMENT OF HUMAN SERVICES,**

    **PETITIONER-RESPONDENT,**

  **V.**

**J.J.,**

    **RESPONDENT-APPELLANT.**

---

       APPEALS from orders of the circuit court for Marquette County: CHAD A. HENDEE, Judge. *Affirmed*.

    ¶1    GRAHAM, P.J.[1]  J.J. appeals orders that terminated his parental rights to three of his children. During the circuit court proceedings, J.J. stipulated to the existence of grounds for termination, but he contested disposition, arguing that it was not in the children's best interests that his rights be terminated. Based

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2)(e) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

2

on its consideration of the factors in WIS. STAT. § 48.426, the court found that it was in the children's best interests to terminate J.J.'s rights.[2]

¶2      On appeal, J.J. argues that the circuit court erred because it based its termination decision in part on his poverty.  I conclude that the court did not erroneously exercise its discretion, and that the transcript reflects that the court appropriately considered the potential implications of the family's finances, among other things, as part of its consideration of the stability of the children's potential placements.  Therefore, I affirm.

## BACKGROUND

¶3      J.J. and his wife have six children together.  In 2021, Marquette County removed the six children from their residence after finding that the home was in "disarray" and the children were living in unsanitary conditions.  The children were later returned to the home.

¶4      In 2023, the three youngest children were again removed from the home under similar circumstances.  The County filed a CHIPS (child in need of protection or services) petition as to each of the three children.

¶5      Then, in July 2024, the County filed petitions seeking to terminate the parents' rights to the three children.  Among other things, the County cited reoccurring concerns about the unsafe physical condition of the home and neglect of the children, and the County alleged, among other things, that each of the three

---

[2] At the same time, the circuit court terminated the parental rights of the mother of the three children involved in these appeals.  The termination of the mother's rights is not at issue here.

3

children continued to be in need of protection or services. *See* WIS. STAT. § 48.415(2) (identifying continuing CHIPS as a ground for terminating parental rights). At the hearing that had been scheduled for factfinding on the existence of grounds for termination, both parents instead entered admissions to the continuing CHIPS ground.

¶6 The circuit court held an evidentiary hearing on disposition. During the hearing, the County put on evidence that, among other things, the children's medical conditions had improved since they had been removed from the family home; that the foster parents for two of the children were willing to adopt; and that an "adoptive resource" had been identified for the third child. The attorneys for the parents asked the court to consider that the family's living conditions had improved after the family moved into a new rental home in October 2024, and photographs of the new home were admitted as exhibits at the hearing.

¶7 The circuit court announced its decision on disposition in an oral ruling. In its ruling, the court discussed each of the six factors mandated for consideration by WIS. STAT. § 48.426(3). Among other things, the court stated that the likelihood that two of the children would be adopted was "clearly very high," and that the likelihood that the third child would be adopted was also high. *See* § 48.426(3)(a). As for the age and health of the children, the court commented on the "significant health concerns, including extreme issues with teeth and the need for dental care," that had "greatly improved" since the children were removed from the home. *See* § 48.426(3)(b). The court considered the testimony "mixed" about whether the children had a strong bond with their parents, and further commented that the children clearly had a strong relationship with their older siblings. *See* § 48.426(3)(c). As for the children's wishes, they had

expressed different wishes at different times and, in the court's view, that factor was a "toss up." *See* § 48.426(3)(d). On the other hand, the total duration of separation—more than 21 months—was "significant" to the court. *See* § 48.426(3)(e).

¶8 The circuit court then turned to the sixth factor, which asks "[w]hether the child[ren] will be able to enter into a more stable and permanent family relationship as a result of the termination." *See* WIS. STAT. § 48.426(3)(f). The court again commented on the prospects for adoption, and it then made the following statement, which is the focus of J.J.'s appeal:

> At the same point, the Court also wants to point out or raise that the children had been removed from the home previously due to the conditions of the home. All six kids were taken out. All were returned, but then that resulted in the removal for this case again. The Court does recognize that factors into the stable and permanent housing.
>
> I want to give the [parents] credit here. The testimony and evidence presented do show that they have housing and have had that for five or six months, if my memory serves, and are making payment on the rent for that home, and it is significantly different than the home that the children were taken out of. At the same point, a large percentage of the income of [the mother], who is the only one working, goes towards that rental. They have $3,400 a month income, and $2,250 goes towards rent alone. In the Court's view, that is a significant portion. That only brings into, at least, concern that may devolve again, and with three more children in the household, that only adds to the stress and tension but also their requirements of care and providing for those kids.

¶9 The circuit court terminated both parents' rights to the three children after finding that it would be in the children's best interests to do so. J.J. appeals.

5

**ANALYSIS**

¶10    In Wisconsin, there is a "two-part statutory procedure" for an involuntary termination of parental rights (TPR). ***Steven V. v. Kelley H.***, 2004 WI 47, ¶24, 271 Wis. 2d 1, 678 N.W.2d 856.  In the first factfinding or "grounds" phase, the petitioner must prove the existence of "one or more of the statutorily enumerated grounds for termination of parental rights" by clear and convincing evidence.  ***Id.***; WIS. STAT. § 48.31(1).  If such grounds are found to exist, the circuit court then proceeds to the second, or "dispositional" phase, in which it decides whether it is in the best interests of the child or children that the parent's rights be terminated.  ***Steven V.***, 271 Wis. 2d 1, ¶27; WIS. STAT. § 48.426(2). Here, the court accepted J.J.'s admission that statutory grounds existed, and J.J. does not claim that any errors occurred during the grounds phase.  His argument focuses solely on the court's decision in the second, dispositional phase.

¶11    In deciding what is in the best interests of the child or children in a TPR case, the circuit court's discretion is guided by WIS. STAT. § 48.426(3)(a)-(f), which provides a nonexhaustive list of six factors the court "'shall consider.'" ***State v. B.W.***, 2024 WI 28, ¶7, 412 Wis. 2d 364, 8 N.W.3d 22 (citation omitted). This court reviews a circuit court's decision on disposition for an erroneous exercise of discretion.  ***Gerald O. v. Cindy R.***, 203 Wis. 2d 148, 152, 551 N.W.2d 855 (Ct. App. 1996).  A circuit court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law and, using a demonstrated rational process, reaches a conclusion that a reasonable judge could reach. ***Loy v. Bunderson***, 107 Wis. 2d 400, 415, 320 N.W.2d 175 (1982).

¶12    J.J. does not claim that the circuit court failed to consider any of the mandatory factors.  Rather, he takes issue with the court's discussion of the sixth

6

factor, which addresses "[w]hether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements."  WIS. STAT. § 48.426(3)(f). According to J.J., the court's discussion of this factor demonstrated unsound reasoning about his poverty, which rendered its dispositional decision erroneous.

¶13  J.J. makes a broad argument, and several narrower ones.  As for the broad argument, J.J. posits that a court errs if it bases its termination decision, even "in part," on the poverty of the parents, and that the circuit court did so here. To this end, J.J. cites two United States Supreme Court cases: *Santosky v. Kramer*, 455 U.S. 745 (1982), and *M.L.B. v. S.L.J.*, 519 U.S. 102 (1996).  In *Santosky*, the Court held that due process requires showings in termination proceedings to be made by clear and convincing evidence, rather than by a preponderance of evidence.  *Santosky*, 455 U.S. at 769-70.  In the course of its discussion, the *Santosky* Court remarked that "parents subject to termination proceedings are often poor, uneducated, or members of minority groups" and that such proceedings are "often vulnerable to judgments based on cultural or class bias."  *Id.* at 763.  Then in *M.L.B.*, the Court held that an indigent mother could not be denied an appeal of the termination of her rights due to her inability to pay fees assessed for preparation of a transcript.  *M.L.B.*, 519 U.S. at 123, 128.  In so doing, the Court stated that a parent's right to appeal a TPR decision may not "turn on ability to pay."  *Id.* at 124.

¶14  The cited cases stand for the general propositions that courts must be mindful of the role that cultural and class bias may play in TPR decisions and must guard against erecting barriers based on a parent's inability to pay.  But

neither decision stands for the broader proposition that a parent's financial situation can never lawfully factor into a court's decision about what is in the best interests of the child. Whatever limits the law may place on the role that poverty can play in a TPR case, J.J. does not cite any authority that would allow me to undo the terminations here on the ground that the circuit court considered J.J.'s finances, among other things, as part of its exercise of discretion.

¶15 I now turn to J.J.'s narrower arguments regarding the specifics of the circuit court's exercise of discretion. Generally speaking, these arguments turn on J.J.'s assertion that the court made determinations about the family's financial situation that were not supported by the information in the record.

¶16 J.J. argues that the circuit court's concern about the portion of family income going to rent reflected a failure to "examine[] the relevant facts." *See Loy*, 107 Wis. 2d at 415. He notes that the family's health care coverage is provided through BadgerCare, and that the monthly rent payments also cover utilities. Thus, J.J. contends, the high percentage of monthly income going to rent is less indicative of precarious finances than might appear.

¶17 One premise of J.J.'s argument is certainly correct: one or two pieces of data are unlikely to provide a comprehensive picture of a family's finances. But the circuit court's comments do not show that the circuit court believed otherwise. The court may have spoken imprecisely in saying that $2,250 went to "rent alone" given that this amount also covered utilities, but either way, approximately two-thirds of the family's monthly income was dedicated to housing, leaving a small margin of safety for unexpected expenses or decreases in income. Further, the court's statement did not pretend to encompass all of the family's expenses; the court simply did not mention health care expenses, just as it

did not mention groceries, phone service, transportation, or clothing.  Each of these expenses would figure in a comprehensive accounting of the family's finances, but this does not mean that the court was wrong in considering the high rent-to-income ratio to be significant.

¶18    J.J. next faults the circuit court for expressing concern that the situation "may devolve again"; he points out that the family's economic situation might instead improve.  Indeed it might, but a court tasked with assessing the chances that a child will have a "stable and permanent family relationship" is necessarily weighing a set of future possibilities.  The language of the sixth factor reflects this by asking the court to "tak[e] into account the conditions of the child's current placement, the *likelihood of future* placements and the results of prior placements."  WIS. STAT. § 48.426(3)(f) (emphasis added).  The court did not say the family's finances would certainly devolve, leading to future removal of the children from the family home; it said only that it was concerned that things "may devolve" as they had in the past.  This was a reasonable statement about future risk, and does not demonstrate failure to examine relevant facts.

¶19    Along similar lines, J.J. argues that the circuit court failed to "demonstrate[] a rational process" because it remained concerned about the family's stability even though the social worker acknowledged that the family's new home was safe for the children and they had been making rent payments for six months.  *See Loy*, 107 Wis. 2d at 415.  But again, the sixth factor required the court to take into account its assessment of what is likely to occur in the future.  The fact that the family appeared to be stable at the time of the dispositional hearing was clearly relevant to this inquiry and the court did consider it, saying that the new home was "significantly different than the home that the children

were taken out of," and that the court was "credit[ing]" the parents for establishing housing "for five or six months" and for "making payment on the rent for that home." But just as clearly, the fact of recent stability did not guarantee future stability, and the court could still reasonably be concerned that the situation might well "devolve" to the point that the children once again had to be removed from the home due to neglect or other dangers.

¶20 Relatedly, J.J. points out that in the CHIPS dispositional order that preceded the TPR petition, the circuit court required that the family maintain stable housing for six weeks as a condition of the children's return. But a CHIPS order serves a purpose distinct from the purposes served by the best-interest factors in a TPR proceeding—the former aims to secure a child's well-being in the short term and is meant to be temporary; while the best-interest factors instead assess long-term prospects and help inform the court's decision about what permanent placement is in the best interests of the child. *Compare* WIS. STAT. § 48.38(4)(f)3. *with* WIS. STAT. § 48.426(3)(f). It was thus not inconsistent for the court to determine, via CHIPS order, that six weeks of stability would be sufficient to permit the children's provisional return to the parents while the CHIPS case was ongoing, but to remain unconvinced that six months of stability demonstrated a strong likelihood that the parents' home would be the best place for the children to remain permanently.

¶21 Finally, J.J. argues that the circuit court improperly considered only the parents' finances, with no corresponding consideration of the potential adoptive family's finances. He argues that it "should not be simply assumed that a foster family is in a better position financially." But the court's discussion does not show that it made such an assumption. Rather, the court identified a fact—

10

economic precarity—that had contributed to the instability of the children's placement with J.J. in the past, and the court expressed concern that such precarity could contribute to future instability. Stability, not financial status, is the quality that the sixth factor required the court to assess. Regarding the foster family, J.J. points to no corresponding evidence demonstrating instability, and so it was not unreasonable for the court to conclude that this factor favored termination.

¶22 In sum, I conclude that the circuit court examined the relevant facts, applied a proper standard of law and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach. *Loy*, 107 Wis. 2d at 415. Because the court demonstrated a proper exercise of discretion, I affirm.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.